## 21968

In the Matter of John Dennis DELGADO, Respondent.
(306 S. E. (2d) 591)

*Atty. Gen. T. Travis Medlock* and *Asst. Atty. Gen. Clifford O. Koon, Jr.*, Columbia, *for complainant.*

*Heyward E. McDonald*, Columbia, and *Ray P. McClain*, Charleston, *for respondent.*

August 8, 1983.

*Per Curiam:*

This attorney grievance matter comes before the Court as a result of a recommendation of public reprimand by the Executive Committee of the Board of Commissioners on Grievances and Discipline. The Respondent, John Delgado, is charged with communicating with a juror in violation of Rule 32 of this Court, DR 7-108(B)(1). He is also charged with having surreptitiously aided a newspaper reporter in gaining entrance to the South Carolina Central Correctional Institute (CCI) for the purpose of interviewing J. C. Shaw, one of his clients who was under sentence to death. His representation of Shaw involved an application in the Court of Common Pleas for post conviction relief, a civil action permitted by § 17-27-10 *et seq.* of the *Code of Laws of South Carolina* (1976). We agree with the Board that a public reprimand is the appropriate sanction.

The Constitution of South Carolina imposes upon this Court the ultimate authority in disciplinary matters. *Burns v. Clayton*, 237 S. C. 316, 117 S. E. (2d) 300 (1960). We may impose sanction in keeping with our view of the evidence independent of the recommendation of the Executive Committee of the Board. Our decision may be for the same or for different reasons.

## I.

Respondent was defense counsel at the criminal trial in the case of *State v. Binkley.* Following the return of a guilty verdict, jurors were drawn to try the case of *State v. Schnupper.* Respondent was also counsel for that defendant. After brief proceedings, all jurors were excused for the day.

Two jurors, Seigler and Jumper, who had served only on the *Binkley* case, were approached by Respondent on the courthouse premises to determine how he might improve his trial skills. Discussion of the *Binkley* case progressed for five to ten minutes when Jenkins, a third juror, approached the group. Jenkins had also served on the *Binkley* case and had been selected to act on the *Schnupper* case.

Respondent testified that Jenkins requested permission to join the group and that he replied, "Yes, but we cannot talk about the case we're trying now." The *Binkley* case was discussed for another five to twenty minutes and included what Respondent refers to as "jury dynamics."

The testimony of the three jurors at the Panel hearing indicates that topics discussed included Respondent's view of a lawyer's role in defending a person he knows to be guilty. Juror Jenkins testified that he asked Respondent some "human interest" questions about his background, legal training, etc., and that he came away from the conversation "impressed" with Respondent.

The contact was reported to the presiding judge who held a brief hearing to determine whether the trial should continue. He ruled that the trial go forward with Jenkins remaining as a juror. Witness Joseph C. Sparks of the Sheriff's Department, who reported the contact, testified: "And I overheard him [Delgado] say that the tables were stacked against the Defense because the Prosecution had such resources to work with to make a case." Respondent Delgado was found in contempt of court for conversing with a juror during the course of a trial and consequently causing a delay in the proceedings.

Respondent's own admissions constitute a clear violation of DR 7-108(B)(1) which provides:

(B) During the trial of a case:

(1) A lawyer connected therewith shall not commu-

nicate with or cause another to communicate with any member of the jury.

Respondent has argued that he was presented with a "Hobson's choice" in that he risked offending the juror by refusing to converse with him or possibly violating a disciplinary rule. The wording of DR 7-108(B)(1) could not be less ambiguous. The rule is intended not only to prevent an intentional attempt to bias or prejudice a juror but to prevent the appearance of impropriety and the possibility of one attorney gaining advantage in a trial by befriending or becoming intimate with a juror through "innocent" conversation. Ethical Consideration 7-29 of the rules emphasizes the total prohibition before and during a trial. It admonishes attorneys to exercise their utmost discretion in communications with jurors or potential jurors even *after* a trial.

The U. S. Fifth Circuit Court of Appeals recently noted that "... jurors, even after completing their duty, are entitled to privacy and protection against harassment." *In Re Express-News Corp.*, 695 F. (2d) 807, 810 (5th Cir. 1982).

The prohibition of DR 7-108 (B)(1) is absolute. It requires that an attorney in Respondent's situation politely but immediately excuse himself from a conversation with (or one joined by) a sitting juror or "with anyone he knows to be a member of the venire from which the jury will be selected for the trial of [a] case" in which he is counsel. DR 7-108(A) and (B).

In former years, it was considered the better practice that attorneys refrain altogether from approaching a juror relative to the action of the juror (and the jury) in a case already tried. This limitation has been somewhat watered down by DR 7-108(D). It provides:

After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service.

While the rule has been somewhat relaxed, an attorney approaching a juror after a verdict is rendered, does so at his own peril. Approaching jurors normally serves no purpose other than to satisfy curiosity. The argument that counsel

wishes to talk to a juror in an effort to improve his trial skills is more often an excuse and not a good reason.

While Respondent did not invite the "now sitting" juror to join in the conversation, he was the author of his own problem by making it possible for it to arise. Although not absolutely prohibited under all circumstances, the Court looks with disfavor upon officers of the court approaching jurors after a verdict has been written. Counsel can eliminate the possible embarrassment to himself and jurors by merely staying away from those who wrote a verdict in cases in which they are involved.

## II.

Respondent represented CCI inmate J. C. Shaw (under sentence to death) in his post-conviction relief trial.

Prior to this proceeding, South Carolina Department of Corrections (SCDC) officials had adopted a policy governing press interviews with inmates on death row. The policy required the approval of: (1) SCDC officials; (2) the inmate's defense counsel; and (3) the prosecuting solicitor.

After inquiry from several members of the news media, Respondent set up an interview-press conference to be conducted at the end of Shaw's post-conviction hearing. Officials of SCDC approved the interview. Just prior to the interview taking place, prosecuting solicitor Anders refused to permit the interview and ordered Shaw returned to CCI.

Having been unsuccessful in arranging a press conference for his client at the courthouse at the end of the post-conviction hearing, Respondent agreed to take his friend, Holly Gatling, to the prison for an interview. She was a reporter for *The State*, a local daily newspaper.

Respondent then called the prison and made an appointment through the Operations Section to meet with his client. A telephone message was delivered to the Warden from Operations stating: "Attorney John Delgado will be here at two o'clock February 14, 1980, to see J. C. Shaw." The Warden gave Operations his authorization for the meeting without any knowledge that Mr. Delgado was in fact arranging an interview for a newspaper reporter.

All visitors at CCI are required to sign a log book where they enter their name, driver's license number, whom they are

to see, and the purpose of their visit. Respondent signed for both himself and Ms. Gatling.

The daily visitor's log reflects entries as follows:

| Name | Driver's Lic. No. | Whom to Visit | Purpose of Visit | Name of Company Rep. |
|------|------|------|------|------|
| John Delgado | 2137901 | J. C. Shaw | Legal | Client |
| L. H. Gatlin | " | " | " | " |

So far as the testimony shows, no legal business was attended. Ms. Gatling interviewed Shaw for forty-five minutes to an hour. She published a two-part story thereafter.

The only reasonable explanation of Respondent's failure to properly sign in Ms. Gatling is that he wished to obscure her true identity and purpose of the visit. From a reading of the entire record, it is inescapable that the Respondent was well aware of the fact that the interview by Ms. Gatling under the circumstances was improper. In making the log book entries he: (1) spelled her surname incorrectly; (2) designated her "L. H. Gatlin" rather than "Holly Gatling", by which name she is usually known and which she uses as a by-line; (3) indicated that her appearance was legal and that the relationship was that of client. The evidence is susceptible of the inference that the Respondent made this interview available to Ms. Gatling because of his long-standing friendship with her and in order to curry favor with the press.

In attempting to justify his action, he contends that his conduct was "... in a continuation of my legal representation of Mr. J. C. Shaw. It was not a social visit or a religious visit. It was, in my mind, a legal visit. That's the reason I dittoed everything else in."

He further testified in response to a question:

> Q. And you took this action to enhance your client's position?
> A. Yes, sir, I did, because I thought the community sentiment was such that Mr. Shaw could benefit from more media exposure that would benefit the character and the individual that we had come to know during the course of our representation.
> Q. There is no question that accompanied (sic) Ms. Holly down there in connection with your representation of Mr. Shaw?

A. Absolutely. We were both there and as a furtherance in the course of my legal representation of J. C. Shaw. That's correct.

He also testified:

No, sir. I think that I have the responsibility as Mr. Shaw's Counsel to attempt to show him in a light that's most favorable to his legal proceeding. That case was concluded. Judge Peeples had already ruled. It was my attempt to show a balanced view of Mr. Shaw based on what I felt the community felt about my client, based on what I felt was inherent in the nature of his crime and more specifically, the facts of his crime.

Disciplinary Rule 7-107(G) provides:

A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication and that relates to:

. . . .

(2) The character, credibility, or criminal record of a party, witness, or prospective witness.

The trial resulting in the death sentence was, of course, a criminal proceeding but the post-conviction action was by statute a civil action. The action of the Respondent was clearly in violation of the rule quoted above. Although the post-conviction hearing in which Respondent was involved had ended at the trial level, it was then and is still now in litigation. A new trial is sought. According to the Respondent's own testimony, the interview was for the purpose of enhancing his client's position. This was a misconception. Respondent misconceives his duty; it was his right to present the cause of his client in the various courts but it was not his responsibility to change the public image of his client. We hold that the interview was not a portion of legal representation and that Respondent knew, or should have known, that the interview was improper.

An interesting discussion of the rights of newspaper reporters to interview prisoners is to be found in *Saxbe v.*

*Washington Post Company,* 417 U.S. 843, 94 S. Ct. 2811, 41 L. Ed. (2d) 514, and in *Pell v. Procunier,* 417 U.S. 817, 94 S. Ct. 2800, 41 L. Ed. (2d) 495. The gist of these rulings of the United States Supreme Court is to the effect that the press has no greater right of access to a prisoner than the general public. Prison authorities are allowed a wide discretion. Generally, only an inmate's lawyer, clergyman, relative, or a friend of the inmate has a right to visitations. Visitations may not be controlled by either the prisoner or his counsel. The effort to bring the interview under the umbrella of legal representation fails.

Respondent's conduct in this instance is made more culpable by the manner in which he misrepresented the purpose of his visit and that of his companion. His conduct in this regard is a violation of DR 1-102(A)(4), which provides:

(A) A lawyer shall not:

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Respondent argues the unconstitutionality of the Code of Ethics violated. We find the same to be without merit. No case in this state has been cited and no opinion of the United States Supreme Court has been indicated. All other courts, in which there is scant authority, including the United States Circuit Courts of Appeal, are not binding on this Court and can, at most, be of interest or influencing.

We agree with the Board of Commissioners on Grievances and Discipline that the Respondent is guilty of misconduct. He, therefore, stands publicly reprimanded.