584 S.E.2d 357

**In the Matter of Donald V. MYERS, Respondent.**

No. 25647.

Supreme Court of South Carolina.

Heard Sept. 19, 2002.

Decided May 5, 2003.

Henry B. Richardson Jr. and Michael S. Pauley, both of Columbia, for the Office of Disciplinary Counsel.

A Camden Lewis, of Lewis, Babcock & Hawkins, of Columbia, for Respondent.

PER CURIAM:

In this attorney disciplinary matter, the Panel of the Commission on Lawyer Conduct recommended that Respondent receive a public reprimand for violating Rule 5.1 of the *Rules of Professional Conduct* (RPC), Rule 407, SCACR, finding that he had failed to ensure that his Deputy Solicitor adhered to these Rules (hereinafter the Quattlebaum Matter). Further, the Panel recommended that Respondent receive a letter of caution for permitting a member of his "jury selection team" to attempt to contact a member of the jury venire (hereinafter the Juror Matter).

## I. THE QUATTLEBAUM MATTER

On Memorial Day, May 29, 1995, Robert Joseph "BJ" Quattlebaum ("Quattlebaum"), a murder suspect, was brought to the Lexington County Sheriff's Department for questioning. John Earl "Jack" Duncan ("Duncan"), Quattlebaum's attorney, arrived at the station shortly thereafter. The Sheriff's Office summoned Deputy Solicitor Frances Humphries ("Humphries") to the station that evening for the interview.

Their initial interviews with Quattlebaum convinced the officers that a polygraph test would flush out some inconsistencies in his statements, so they asked Quattlebaum to take a polygraph test, and he consented. David Grice ("Grice"), the polygraph operator for the Lexington County Sheriff's Department, conducted a two-hour interview of Quattlebaum in the polygraph room, a small room equipped with a video surveillance camera. Grice left the room giving Quattlebaum time to "stew" over his responses and returned to his office, where he monitored and recorded what occurred in the polygraph room through a television monitor and a VCR machine.

Deputy Scott Frier ("Frier") was in Grice's office when Grice returned. Both men looked at the monitor and saw that Jack Duncan had entered the polygraph room and began having a conversation with his client. The VCR had ejected the videotape that was inside it, so Grice pushed the tape back into the machine and pushed the record button. Duncan and Quattlebaum were unaware that Grice was recording their conversation.

Grice and Frier then summoned Deputy Solicitor Humphries, lead investigator Edward Hite ("Hite"), and Lieutenant "Bucky" Phillips to the office to witness the events that were unfolding in the polygraph room. The officers arrived first and saw and heard the privileged conversation between Quattlebaum and Duncan. When Humphries arrived shortly thereafter, he saw the monitor, heard the conversation, and the officers told him "two words"[1] to describe what the suspect had uttered to his lawyer. Humphries told the officers to turn the monitor off and left the room. As he

---

1. In deference to the fact that Quattlebaum is awaiting retrial, "two words" is the way that the record describes the overheard statement Quattlebaum made to his attorney.

departed, Humphries was asked if he thought the conversation could be used as evidence against Quattlebaum and responded, "not unless the Supreme Court has ruled differently over the last twenty-four hours." Grice originally intended to return to the polygraph room to continue the polygraph examination, but the plan changed when the officers arrested Quattlebaum shortly after Duncan left the polygraph room.

Respondent Donald V. Myers is the Solicitor for the Eleventh Judicial Circuit. He has served with distinction for 26 years and has never previously been disciplined for any lawyer misconduct. Around a week later, Humphries reported to his superior, Solicitor Myers, what transpired the night of May 29. Respondent Myers learned that the group overheard a confidential conversation between Duncan and Quattlebaum and that the suspect uttered "two words" relating to the substance of the conversation, which dramatically enhanced the import of the dialogue. Humphries informed the Respondent that he told the officers to turn off the monitor, and Respondent stated that Humphries had responded appropriately to the scenario. As of this meeting, no evidence shows that Respondent Myers knew that the conversation was recorded, and there is conflicting evidence as to whether Humphries knew that Grice was recording the conversation.[2] Respondent did not instruct Humphries, his Deputy Solicitor, that he should inform the defense that he and the officers eavesdropped on a privileged conversation of significant substance. Grice placed the tape in the safe in his office.

On June 2, 1995, Detective Hite submitted his eleven-page Investigative Report about the murder for which Quattlebaum was charged. The highly detailed report failed to include an account of the eavesdropped confidential conversation, nor did the report disclose that the conversation was recorded on videotape. Respondent Myers testified that the report should have included those facts, which is how the defense would have discovered that the conversation was overheard. Humphries reviewed the report after Hite finished it and made no comment about the lack of disclosure. The Solicitor's office made no effort to disclose to the defense the fact that Humphries

---

**2.** Grice testified that after Humphries told the officers to turn off the tape, Grice asked Humphries what he should do with the tape.

and the officers had heard and taped the confidential eaves-dropped conversation. The defense did not discover the fact that the conversation was eavesdropped or the existence of the tape for another twenty-seven months, until just three months before the scheduled commencement of the Quattlebaum trial.

As of around March 1996, Humphries had discussed the potential existence of a tape recording of the Duncan/Quattleb-aum conversation with Detective Hite, who would frequently ask Humphries what he should do with the tape. Eventually, Humphries reported a "rumor" of the tape's existence to Respondent Myers. The two discussed whether the tape was discoverable, and Respondent Myers stated that if there was a tape, Humphries should give it to the defense.[3] Despite the frequent conversations with Detective Hite and Respondent's mandate to hand it over to the defense, Humphries made no specific request for the tape to the Sheriff's Department.

On June 30, 1997, Quattlebaum's new attorney, Katherine Evatt ("Evatt"), sent Humphries a discovery request that included a specific demand for "copies of all videotape or audiotape of any interviews with the Defendant." Evatt made the request for audio or video recordings merely as a "catch-all" request. She had no reason to believe that the videotape existed. Humphries discussed the discoverability of the tape again with Respondent, and was again instructed to hand over the tape to the defense. Humphries then informed Detective Hite to make a copy of the tape. Hite immediately asked Grice to make a copy, and the copy was delivered to Hum-phries.[4] Humphries delivered the tape to defense counsel Kathy Evatt on August 8, 1997.

The Quattlebaum matter eventually went to trial in the Eleventh Circuit. Quattlebaum's attorneys moved for the recusal of Humphries and the Eleventh Circuit Solicitor's Office as prosecutors because of the surreptitious intrusion upon the confidential conversation between Quattlebaum and Duncan. The trial judge denied the defense's motion, and

---

**3.** Hite testified that when he would mention the tape to Humphries, he never said there was a "rumor" of the tape. He would only ask Humphries for instructions as to what to do with the tape.

**4.** Hite testified that it might have taken only one day to deliver the tape to Humphries after Humphries requested it.

Quattlebaum was ultimately convicted and given a death sentence. On appeal, the South Carolina Supreme Court overturned Quattlebaum's convictions and sentence because we found that the Eleventh Circuit Solicitor's Office had committed deliberate prosecutorial misconduct, which deprived Quattlebaum of his Sixth Amendment right to counsel.[5]

### *Panel Finding*

The Commission on Lawyer Conduct dismissed the charge that Respondent violated Rule 5.1(c) of the *Rules of Professional Conduct* (RPC), Rule 407, SCACR, finding that he never secreted from the defense the existence of the videotape or the fact that Humphries and the officers overheard the Quattlebaum–Duncan conversation. However, the Panel held that Respondent violated RPC 5.1(b), Rule 407, SCACR, because as a supervising attorney, he should have ensured that Humphries disclosed the tape's existence or the occurrence of the eavesdropped confidential conversation. Accordingly, the Panel recommended a penalty of public reprimand. Respondent has taken exception to the Panel's finding that he violated RPC 5.1(b).

### *Law/Analysis*

In an attorney disciplinary proceeding, this Court gives great deference to the recommendation of the Panel of the Commission on Lawyer Conduct. *In re Diggs* 344 S.C. 397, 544 S.E.2d 628 (2001). However, the Court may exercise de novo review of the Panel's findings of fact and conclusions of law. *Id.* Furthermore, the State must prove that the attorney violated a rule of Professional Responsibility by clear and convincing evidence. *Id.*

We find the Panel correctly held that the State proved by clear and convincing evidence that Respondent violated RPC 5.1(b), which provides: "A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." In order to establish that Respondent violated RPC 5.1(b), the state must prove that (1) Re-

---

5. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000).

spondent held "direct supervisory authority" over Humphries; (2) Humphries failed to adhere to the Rules of Professional Conduct; and (3) Respondent failed to "make reasonable efforts" to ensure that Humphries adhered to the Rules of Professional Conduct. *In re Anonymous Member of the South Carolina Bar,* 346 S.C. 177, 184–185, 552 S.E.2d 10 (2001).

Respondent, as Solicitor, held supervisory authority over his Deputy Solicitor, Humphries. Further, the Panel of the Commission of Lawyer Conduct found that Humphries violated the Rules of Professional Responsibility.[6] In assessing whether Respondent made reasonable efforts to ensure Humphries was complying with the Rules, this Court must consider the Comments to RPC 5.1:

The measures required to fulfill the responsibility prescribed in paragraphs (a) and (b) can depend on the firm's structure and the nature of its practice. In a small firm, informal supervision and occasional admonition ordinarily might be sufficient. In a large firm, *or in practice situations in which intensely difficult ethical problems frequently arise, more elaborate procedures may be necessary.*[7]

We hold that the Panel correctly concluded that the Eleventh Circuit Solicitor's Office is a law office where complex ethical questions arise, which necessitate a more elaborate system to ensure that the attorneys in the Solicitor's Office comply with the Rules. Respondent's supervisory system failed because the defense knew nothing of either the eavesdropped conversation between Duncan and Quattlebaum or that it had been videotaped for over two years.

### The Eavesdropped Conversation

■ Respondent learned of the surreptitious intrusion upon the Duncan/Quattlebaum conversation approximately one

---

6. The Panel found that Humphries violated the rules when he: (1) Failed to immediately notify Jack Duncan that the police and Humphries had overheard his privileged conversation with Quattlebaum; (2) Failed to ensure that the Hite Investigative Report disclosed the interception of the Duncan/Quattlebaum conversation; (3) Failed to immediately investigate whether a videotape of the Duncan/Quattlebaum conversation existed.

7. Comments to RPC 5.1(emphasis added).

week after it occurred. At that time, respondent told the Deputy Solicitor that he had appropriately directed the officers to turn off the monitor, but Respondent did not instruct the Deputy Solicitor to inform the defense of the eavesdropped conversation and the "two words" that Quattlebaum uttered. Respondent failed again to order his Deputy Solicitor to communicate the fact of the overheard conversation to the defense when Humphries brought up the "rumor" of the videotape some ten months later in March 1996.[8] In fact, the only reason why the defense discovered that the Duncan/Quattlebaum dialogue was overheard was because on June 30, 1997, defense counsel Evatt made a discovery motion, which included a request for any video or audiotape of the defendant. Only then, when Humphries responded to the request on August 1, 1997, by stating that the defense would receive "[a] copy of a videotape containing statements made by the Defendant" did the defense have any notion that Humphries and the Lexington County officers had intruded on the Duncan/Quattlebaum attorney-client conversation.

Respondent testified that he assumed that Detective Hite's Investigative Report would have revealed the existence and nature of the eavesdropped conversation. As discussed, the Report contained no account of the incident, and Humphries knew the detail was left out because he reviewed the document before he gave it to the defense. Respondent's supervisory system failed because he assumed that Detective Hite, an officer from another government agency (the Lexington County Sheriff's Office) would inform the defense through an Investigative Report about the eavesdropped conversation. Respondent's supervisory system also failed because he did not ensure that Humphries himself communicated to the defense about the overheard dialogue. Accordingly, Respondent failed in his supervisory capacity to ensure the defense promptly learned of the eavesdropped conversation and thus violated RPC 5.1(b).

### The Videotape Recording

While we find Respondent's failure to ensure that the defense learned of the *eavesdropped conversation* supports a

---

8. He did, however, instruct Humphries to turn over the tape if it existed.

finding that Respondent has violated RPC 5.1(b), we do not believe that his handling of the *videotape* violated the Rules of Professional Conduct. First, no evidence points to Respondent having any knowledge of the tape's existence until Humphries gave it to the defense on August 8, 1997. While a lack of knowledge is not a complete defense to a violation of Respondent's duty to supervise,[9] Respondent sufficiently stated his office's policy when Humphries brought up the videotape "rumor" in March 1996: "If there is a tape, give it to the defense." (R.p. 510). Respondent's clear articulation of what to do with the tape constitutes sufficient "reasonable efforts" by Respondent to ensure that Humphries complied with the Rules.

In our opinion, however, the Panel incorrectly held that Respondent did not violate RPC 5.1(c). Rule 5.1(c) states:

(c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

(2) The lawyer is a partner in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and *knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.*[10]

Respondent knew that Humphries and the officers eavesdropped on the privileged conversation within one week after it occurred, while the defense did not know of the intrusion into the Quattlebaum–Duncan dialogue until twenty-seven months later. Respondent should have made sure that Humphries informed the defense immediately, or he could have called defense counsel himself. Immediate notification would have given Quattlebaum twenty-seven more months to protect his rights [11] and would have avoided the necessity of this

---

9. *In re Anonymous,* 346 S.C. 177, 552 S.E.2d 10.

10. Rule 407, SCACR, *Rules of Professional Conduct,* Rule 5.1(c).

11. After Humphries' first meeting with Respondent, Respondent knew of the "two words" that Quattlebaum uttered during his conversation

Court's finding of deliberate prosecutorial misconduct and breach of Quatttlebaum's Sixth Amendment right to counsel.[12] Because Respondent failed to immediately inform the defense himself or through Humphries, his Deputy Solicitor, we find that he violated RPC 5.1(c).

For the violation of both RPC 5.1(b) and RPC 5.1(c) in failing to properly supervise Humphries to ensure that the fact of the eavesdropping was reported to Quattlebaum's defense counsel, we sanction Respondent with a Private Reprimand. *See In re Anonymous*, 346 S.C. 177, 552 S.E.2d 10 (2001).

We hold a solicitor in this state to the highest ethical standards, for his actions determine a criminal's fate. We understand that the pressures of the position, as well as imperfect communication procedures with the county sheriff's office, may impede the solicitor in exercising his supervisory authority, but no excuse can justify actions which prejudice the defendant in a capital case.

A solicitor must implement and manage a system that enables him to appropriately supervise his deputies so that when he discovers that they may be violating a Rule of Professional Conduct, he can immediately ameliorate any prejudicial effect that the violation may have on the defense.

### *RPC 5.1(a) and Government Agency*

Respondent argues that RPC 5.1(a) only applies to a private law firm. We disagree. RPC 5.1(a) states: "A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance

---

with Duncan. Respondent's knowledge of this severe intrusion into the attorney-client conversation, coupled with his failure to make sure the defense knew about it, is the only reason why he should be sanctioned. Further, a strong presumption exists that the officers arrested Quattlebaum shortly after they heard the conversation due to what Quattlebaum said to Duncan. Consequently, the defense had to wait over two years to even pursue its constitutional defenses, such as the "fruit of the poisonous tree" doctrine.

12. *Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105.

that all lawyers in the firm conform to the Rules of Professional Conduct." RPC 5.1(a).

We agree with the Comments to RPC 5.1, which clearly state that RPC 5.1(a) applies to government agencies, as well as law firms.[13]

## II. THE JUROR MATTER

■ The Eleventh Circuit Solicitor's Office tried the death penalty case of Robert "Bo" Southerland ("Southerland") in March of 1992. On the night before striking the jury, Respondent assembled his "jury selection team," as was customary before a murder trial. The group of officers and Respondent met in Respondent's conference room to review the names on the jury venire to determine which jurors the prosecution would strike in the next day's voir dire. The group immediately singled out Richard Otto Cannon as the first potential juror that Respondent should strike. Respondent was familiar with many Cannons who were criminals in his district and did not want him as a juror for a capital case.

The group also noticed two different addresses on Cannon's Juror Questionnaire with only one phone number. In order to discern if Cannon lived at the address on the Questionnaire, an officer at the other end of the table from Respondent picked up the phone, dialed the number, announced that he represented law enforcement, and asked whether Richard Otto Cannon lived at the specified address. The person who answered the phone stated that Cannon did not live at that address.

### *Panel Finding*

The Panel concluded that Respondent violated RPC 8.4 of the *Rules of ProfessionalConduct* (RPC), Rule 407, SCACR, when he impliedly permitted a member of his "jury selection team" to telephone a potential juror and recommended a letter

---

13. "Paragraphs (a) and (b) refer to lawyers who have supervisory authority over the professional work of a firm *or legal department of a government agency*. This includes members of a partnership and the shareholders in a law firm organized as a professional corporation; *lawyers having supervisory authority in the law department of an enterprise or a government agency ...*" Comments to RPC 5.1 (emphasis added).

of caution. Respondent has taken exception to the Panel's finding of an RPC 8.4 violation.

### *Law/Analysis*

Rule 3.5(b) of the *Rules of ProfessionalConduct* (RPC), Rule 407, SCACR, forbids a lawyer from communicating ex parte with a member of the jury venire. RPC 8.4 forbids a lawyer from violating the Rules of Professional Conduct through the acts of another. RPC 3.5(b) was violated when a member of Respondent's "jury selection team" dialed the number of Richard Otto Cannon, a member of the jury venire, while the group was meeting in Respondent's conference room on the eve of jury selection for the Southerland murder trial. Although the team member did not call Cannon at Respondent's direction, Respondent failed to stop him from making the call. Just as this Court "looks with disfavor upon officers of the court approaching jurors after a verdict has been written," [14] it also should not condone pre-trial contact with a member of a jury venire. Since Respondent allowed a member of the "jury selection team" to contact Mr. Cannon, he violated RPC 8.4(b).

This court has issued a public reprimand to an attorney who approached jurors after his trial was over but while the jurors remained on the venire.[15] But since Respondent did not actively attempt to communicate with prospective juror Cannon, and since the state presented no other evidence of juror contact by Respondent or any member of his "team," we find a letter of caution is appropriate.

### III. COSTS OF THE PROCEEDINGS

Rule 7(b)(8), of the *Rules for Lawyer Disciplinary Enforcement,* (RLDE), Rule 413, SCACR, states that an attorney who violates the Rules of Professional Responsibility may be responsible for the costs and fees of the disciplinary proceedings. Further, Rule 27(e)(3) of the *Rules for Lawyer Disciplinary Enforcement,* (RLDE), Rule 413, SCACR, states that, "[t]he Supreme Court may assess costs against the respondent if it finds the respondent has committed misconduct." The

---

14. *In re Delgado,* 279 S.C. 293, 306 S.E.2d 591 (1983).

15. *In re Smith,* 338 S.C. 465, 527 S.E.2d 758 (2000).

state argues that the Panel erred in not addressing the cost issue and asks the Court to assess costs upon the parties in its discretion. We find that Respondent is responsible for the costs of these proceedings.

## IV. CONCLUSION

Respondent failed to adequately supervise his Deputy Solicitor Fran Humphries in the wake of the bizarre events that took place on May 29, 1995. Since Respondent did nothing in his supervisory capacity to ensure that his office disclosed that a privileged attorney-client conversation was overheard, he violated RPC 5.1(b) and RPC 5.1(c) of the Rules of Professional Responsibility.

This Court must now determine what sanction is appropriate. We are aware that any disciplinary sanction we impose in this matter will be made public because of the procedural posture of this case. Under our current Rules for Lawyer Disciplinary Enforcement (RLDE), thirty days after the answer has been filed or the time to answer has expired in a misconduct case, the record and all subsequent proceedings are made public no matter what the ultimate disposition may be. Rule 12(b), RLDE. It would, therefore, be a simple expedient to agree with the panel and impose a public reprimand. We do not believe that would be fair to Solicitor Myers, because it would treat him differently from the way we treated the civil lawyer in *In re Anonymous*.

In this case, we have not found that Solicitor Myers engaged in any direct misconduct. He is being disciplined because he did not exercise the appropriate supervisory control over his Deputy Solicitor, Fran Humphries. Similarly, in *In re Anonymous*, we disciplined a civil lawyer, partner in a law firm, for his failure to ensure that his subordinate lawyers turned over discovery material to opposing counsel in a serious products liability case. There, we imposed a private reprimand. We found the conduct to be a serious breach of the lawyer's duty to supervise as we do here. We imposed private discipline because it was the first time we as a court had given direction in this area.

South Carolina has had since 1990 a stronger "duty to supervise" rule than many states. This is the first case in which we have made it clear that this "duty to supervise" also

applies to public attorneys and to Solicitor's offices. The Respondent has had no other disciplinary matters in his 31 years of practice. All these factors influence the level of discipline we impose for this violation.

The vast majority of the misconduct relating to the failure to supervise was committed before the Rules of Lawyer Disciplinary Enforcement became effective on January 1, 1997. Under the former Rule on Disciplinary Procedure, the appropriate sanction would have been a private reprimand, and we find that is the appropriate sanction in this case. While, as discussed above, the private nature of the reprimand cannot be maintained under our current procedure, a private reprimand still has significance since it is not reported to the American Bar Association's National Discipline Data Bank and indicates our belief that the misconduct warrants less than a public reprimand. Accordingly, we impose a private reprimand under Paragraph 7A(5) of the former Rule on Disciplinary Enforcement.[16]

Additionally, we also hold that Respondent violated RPC 8.4 when he permitted a member of his "jury selection team" to attempt to contact a member of the jury venire. We issue a letter of caution for this violation.

TOAL, C.J., MOORE, WALLER, BURNETT, JJ., and Acting Justice EDWARD B. COTTINGHAM, concur.

---

**16.** Under Rule 7(b)(10), RLDE, this Court may impose any sanction or requirement that it determines is appropriate. Therefore, this Court is not limited to the sanctions listed in Rule 7.