2013 OK 110

**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Stephen Eric McCORMICK, Respondent.**

**No. SCBD–6010.**

Supreme Court of Oklahoma.

Dec. 17, 2013.

Loraine Dillinder Farabow, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Stephen Eric McCormick, Tulsa, Oklahoma, for Respondent.

### OPINION

WATT, Justice.

¶ 1 The Petitioner Oklahoma Bar Association (OBA) brought a disciplinary action against Stephen Eric McCormick, Respondent, under the provisions of Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2001, Ch. 1, App. 1–A. The OBA alleged McCormick committed specific acts constituting professional misconduct in violation of the Rules of Professional Conduct (ORPC), 5 O.S. Supp. 2008, Ch. 1, App. 3–A and the RGDP, supra. The OBA raised two counts in its complaint.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Count I is the Johnson Grievance filed on July 30, 2012, by Melanie Jeanne Johnson who hired McCormick to represent her in a personal injury claim. The OBA alleged McCormick abandoned Ms. Johnson's case after advising her in February, 2010, of a settlement offer received in December, 2009.

She rejected the settlement offer. The OBA also alleged McCormick failed to return telephone calls to his client or the insurance company making the offer, resulting in the running of the statute of limitations applicable to her claim.

¶ 3 Count II is McCormick's Failure to Respond to the Office of the General Counsel to the allegations raised against him. The OBA contacted McCormick on August 10, 2012, by letter, requesting him to respond to the complaints raised in Ms. Johnson's grievance within two weeks. When no response was received, the OBA sent another letter on September 4, 2012, requesting a response within five days to avoid further action being taken. After still no response, the OBA advised McCormick on October 11, 2012, that the grievance was opened for formal investigation to be presented to the Professional Responsibility Commission (PRC) which would then decide what further action would be taken.

¶ 4 On November 29, 2012, the OBA sent a certified letter, warning McCormick that a subpoena duces tecum requiring his sworn testimony and the production of relevant books and records would result if he did not respond within five days. When no response was received, the OBA hired a private process server to serve McCormick personally. This was accomplished on January 23, 2013. He appeared for his deposition which was held on February 5, 2013, although arriving one hour late without the file he was directed to bring with him.

¶ 5 A formal hearing, at which McCormick appeared, was held on June 20, 2013, before the Professional Responsibility Tribunal (PRT). Because McCormick failed to answer the complaint, the OBA moved to have the allegations against him deemed admitted pursuant to Rule 6.4, RGDP.[1] McCormick did not object, and the PRT granted the motion. The rule provides for submitting evidence for the purpose of determining the proper discipline to be imposed. McCormick submitted no evidence or called any witnesses on his behalf. The OBA called Ms. Johnson to testify and submitted supporting evidence. The OBA also called Craig Carter to testify via telephone. Tommy Butler, the OBA's investigator, also testified.

¶ 6 On July 9, 2013, the PRT filed its report. As to Count I, the panel found by clear and convincing evidence that McCormick violated Rules 1.1,[2] 1.3,[3] 1.4,[4] 3.2[5] and 8.4(a)(d)[6], ORPC, and Rule 1.3, RGDP.[7] As

1. Rule 6.4 provides:

   The respondent shall within twenty (20) days after the mailing of the complaint file an answer with the Chief Justice. The respondent may not challenge the complaint by demurrer or motion. In the event the respondent fails to answer, the charges shall be deemed admitted, except that evidence shall be submitted for the purpose of determining the discipline to be imposed.

2. ORPC Rule 1.1. Competence.

   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

3. ORPC Rule 1.3. Diligence

   A lawyer shall act with reasonable diligence and promptness in representing a client.

4. ORPC Rule 1.4. Communication

   (a) A lawyer shall:
   (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
   (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
   (3) keep the client reasonably informed about the status of the matter;
   (4) promptly comply with reasonable requests for information; and
   (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

5. ORPC Rule 3.2. Expediting Litigation

   A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

6. ORPC Rule 8.4(a)(d) Misconduct

   It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

to Count II, the panel found by clear and convincing evidence that McCormick's conduct violated the mandatory provisions of Rule 8.1(b),[8] ORPC, and Rules 1.3 [9] and 5.2,[10] RGDP. The panel recommended a one-year suspension as the appropriate discipline. The OBA requests the Court to accept the recommendations of the PRT and to impose a one year suspension of McCormick's license to practice law and to assess costs in the amount of $1948.01.

## STANDARD OF REVIEW

¶ 7 This Court exercises exclusive original jurisdiction as a licensing court in bar disciplinary proceedings. *State ex rel. Oklahoma Bar Association v. Rowe*, 2012 OK 88, 288 P.3d 535. We have the responsibility to examine the record and assess the credibility and weight of the evidence to determine whether it clearly and convincingly establishes McCormick committed professional misconduct, and if so, what the appropriate discipline should be. *State ex rel.*

*Oklahoma Bar Association v. Rowe*, *supra;* *State ex rel. Oklahoma Bar Association v. Edwards*, 2011 OK 3, 248 P.3d 350. Our standard of review is *de novo*, and the recommendations of the PRT are not binding on this Court. *State ex rel. Oklahoma Bar Association v. Todd*, 1992 OK 81, 833 P.2d 260, 261.

## EVIDENCE

### Count I: The Johnson Grievance

¶ 8 Ms. Johnson, now a sixth grade teacher in Sand Springs, Oklahoma, was involved in an auto accident on or about October 20, 2008. She sustained physical bodily injury as well as property damage to her vehicle as a result of the accident. She settled the property damage claim herself. She testified she hired McCormick a "couple of months" after the accident to handle her personal injury claim for reimbursement of medical bills, medical treatment and lost time from work.[11] She wanted him to "handle talking

---

. . .
(d) engage in conduct that is prejudicial to the administration of justice; . . . .

7.  RGDP Rule 1.3. Discipline for Act Contrary to Prescribed Standards of Conduct
    The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

8.  ORPC Rule 8.1(b). Bar Admission and Disciplinary Matters
    An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
    . . .
    (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

9.  See note 6, *supra.*

10.  RGDP Rule 5.2. Investigations

After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

11.  The date on the contingency fee agreement is August 20, 2008, but she testified the date should be August 20, 2009.

with the people through the insurance" because she was not getting anywhere on her own. She testified that she obtained some physical therapy for her back and hip, had an MRI and missed time from work. At the time of the accident, she was working at a part-time job converting paper files into documents by "scanning them into XML." [12] The other driver involved was at fault and was insured by USAA. She said she received an e-mail on February 9, 2010, from McCormick advising her of an offer of settlement of $5700.00 from USAA which she did not think was fair. McCormick's e-mail said, "It looks like this one is heading to court. We should probably discuss that via phone or we can set up a meeting. Steve." However, she said they did not meet, and that was the last correspondence she had with him.

¶ 9 After receiving the e-mail from McCormick, until she filed her grievance in July, 2012, Ms. Johnson stated she tried to call him at least a hundred times. The calls went straight to voicemail most of the time. When calling his former law firm, she was told he was no longer there, and the firm had no forwarding number or any way to contact him. She paid most of her medical bills herself which created a financial hardship for her. She testified she is still in the process of paying physical therapy bills after working out a payment plan. Her medical bills totaled approximately $5,600. She has paid all but $2,410.00. She further testified:

Q. And did Mr. McCormick, after that February of 2010 e-mail exchange, ever get back with you about whether or not you wanted to reconsider or except (sic) that $5,700 settlement offer that USAA made?

A. No. I never heard from him again.

. . .

Q. Are you still getting medical treatment?

A. I have not. I keep trying to tough it out because I've tried to just try to walk a lot and exercise to try to take care of it, but I'm probably going to go back at some

point because it hasn't helped a lot. It just seems to have gotten worse lately.

Q. Would future medical problems have been something that you wanted Mc. McCormick to take care of.

A. Yes. That was a big part of it.

¶ 10 When asked if McCormick ever took steps to advise her when her statute of limitations would run in her case, she answered, "Not that I can recall."

¶ 11 McCormick testified that at the time he took Ms. Johnson's case, he was practicing at his father's Tulsa law firm where he worked approximately five years. He also said the date on her contract should have been August 20, 2009, instead of 2008. He was asked about whether there was a docketing system in his dad's firm to indicate when a statute of limitations would run. He stated no one in the firm docketed it, but that he put it in a computer and also used a planner. He was asked if he placed the injury date and statute of limitations date visibly on the file, to which he answered, "Yes." He entered into an office-sharing arrangement with Craig Carter of Tulsa soon thereafter for approximately six months. He also said Ms. Johnson's case is one of the files he took with him when he left his father's firm.

¶ 12 He did not have voicemail set up at Carter's office. If Ms. Johnson needed to contact him, she would have to call the main office number or McCormick's cell phone number. He admitted he never did anything to initiate contact with her to ensure her statute of limitations did not run. He agreed that when he left Carter's office space, he did nothing to notify USAA that he was changing addresses or that he still represented Ms. Johnson.

¶ 13 He testified he was practicing law full-time in December, 2009. However, he and a partner had begun negotiations to purchase a business, Bedlam Sports. He said this venture took about nine months, until June of 2010, to negotiate and close. Ms. Farabow asked him why he did not respond to the letters dated December 28, 2009, February 9,

12. She missed a couple of months of work. Then, after returning to work, she didn't work long because she had difficulty sitting.

2010, and March 11, 2010, from USAA regarding its settlement offers to Ms. Johnson. He stated that after discussing it with Ms. Johnson, he responded to USAA about the settlement by phone instead of in writing. He also stated that it "may be a true statement ..." that Ms. Johnson never heard from him again after his e-mail dated February 9, 2009. He was also asked why USAA sent him a letter dated October 1, 2010, stating there had been no communication with him since December 28, 2009. He answered that he had never gotten the letter, after vacating Mr. Carter's office. He also indicated he had told Mr. Carter where he was going and to advise him of future mail deliveries. In an apparent attempt to blame Mr. Carter for his not receiving the USAA letter, he said, "And I didn't realize that some of this stuff had shown up, so I don't know if he was just tossing it or what. I'm not excusing (sic). I'm just saying I didn't get that." He admitted he had not notified either Ms. Johnson or USAA that he had moved again.

¶ 14 When asked why he took no steps to mitigate Ms. Johnson's damages, Ms. Farabow reminded him that after his deposition, they had discussed the matter as a means of helping him present some kind of mitigation to the PRC and to show he was remorseful and took responsibility for his actions. She had suggested notifying his malpractice carrier of a potential claim and cooperating with them, or finding out what Ms. Johnson sustained in damages, trying to make her whole. She said at no time did the OBA's office attempt to advise him or force him to do any of those things. She said he had just wanted to know what his options were and what some things were he could do. He agreed that they had a conversation, but that he did not remember it the same way or understand it. When asked why he had not apologized to Ms. Johnson verbally or in writing, he answered he did not feel that he had any right to do anything like that "when this thing got started".

¶ 15 When asked whether he wanted to practice law in the future, McCormick testified he was unsure, but does not want to be told he cannot practice law.[13] He testified that, other than Ms. Johnson's case, he was handling two other cases at that time. He was unable to think of any others that "may have slipped through the crack or [in which he] dropped the ball...." When asked if he was "fit and competent" to practice law, he answered:

A. I think when I was doing it full-time, the answer to that was yes. But when I got hooked up with this business, it's—it's been a—I don't know. It's-it is tough to even keep up with a couple of the people

---

13. He then said:

> [A]nd I guess if I had to put it in perspective, you know, I—I'd rather it be—I guess I'd rather be the master of that decision from the standpoint of that I would not be necessarily in this position where maybe it's the Oklahoma Bar Association that does this. I'd rather it be, you know what, I'm just done with going through the CLEs or whatever and I'm just done with it, or at least just keep it up and, you know, just have a license but not actually practice anymore. And I have tried to answer that question for you. I mean, it tugs at me. I mean, it's been—since this hearing has been scheduled, it's tugged at me, and I just—I don't know. I don't—I'll put it to you this way. Regardless, I really—at least until I get things settled down with Bedlam and where I want that business to be and whatever else my business partner and I decide to do, I mean, I really am not going out and I haven't been. I've not been going out and soliciting new clients. I mean, I'm not really trying to practice right now at all. You know, should I just

give up my license? I'm not necessarily wanting to do that. I was proud when I passed the Bar, but, at the same time, I started looking at, you know, I kind of let myself down, obviously I've let Ms. Johnson down, and in some respects—you know, in some—in a lot of respects I have probably let the State of Oklahoma down. And I don't—I don't know if that's a good enough answer for you. I mean, I don't know.
> Q. You don't know?
> A. I don't know if I'll—if I'll try to get back into it full-time again or not. I just don't know. I don't—**I don't necessarily see that being my future, but I don't necessarily like cutting things off either.** I mean, it's nice having options, you know. I don't have the option to be a doctor because I didn't go to medical school. You know, it's not something I can just go do. I did—I did go through a lot of school and pass the Bar, so, I mean, I can go out and do that if I choose to. **But, you know, at this juncture, at this time right now, that's really not something that I'm choosing to do, if you will.** [emphasis added]

I'm dealing with right now on—especially with this business that I've got.

Q. You're saying you're having difficulty communicating or keeping up with the demands of the two clients that you have?

A. Yeah. To some degree, yes.

Q. Do you feel that you are diligently handling their legal affairs?

A. Probably not as well as I'd like.

¶ 16 McCormick explained that the two cases were with people who were associated with his new business who were aware of his lack of diligence. One is the co-owner of his business. The other is a client from whom he obtained the business. The client was in foreclosure because his tenants were not paying rent. McCormick and his business partner bought the business from the client's tenant.

¶ 17 Attorney Craig Carter testified at the hearing. He testified that McCormick rented office space from him for approximately six months in 2010. About two months before vacating Carter's office, Carter testified McCormick had left all of his property, including case files and computer, at the office, but stopped coming to the office. Carter began receiving calls from McCormick's clients in an effort to contact him about their cases. Although Carter attempted to contact McCormick, he never got a response. Carter eventually attempted to contact McCormick's father at his firm and Respondent at his home address to tell them what was going on at his office. Carter informed McCormick that it appeared the statute of limitations had run in McCormick's personal injury case (Johnson). Although he heard from McCormick's father, he never heard from Respondent. Carter stated he realized he had no way to contact McCormick, to whom he had given an office key and who had left property inside. Then, after waiting a "week or two" for a response to his letters, Carter filed a formal report with the OBA to advise what was going on. McCormick moved his property out of Carter's office in June or July, 2010.

¶ 18 When asked for a closing statement, McCormick testified "to clarify" some things. He said he checked into the process for forwarding his mail when he left Carter's office. He said he was told by the post office that forwarding his mail from Carter's office would also forward Carter's mail.

■ ¶ 19 The PRT's conclusion that McCormick violated Rules 1.1, 1.3, 1.4, 3.2 and 8.4(a)(d), ORPC, AND Rule 1.3, RGDP, is supported by clear and convincing evidence. McCormick failed to prepare and provide the thoroughness necessary to represent Ms. Johnson. He also failed to act with diligence in his representation of Ms. Johnson as well as adequately communicating with her, much less expediting her claim when necessary. He left it up to her to contact him, rather than taking it upon himself to contact her. His conduct ultimately led to the expiration of her statute of limitations and the end of her claim. We thus find McCormick engaged in conduct which is prejudicial to the administration of justice and which brings discredit to the legal profession.

## Count II: Failure to Respond to the Office of the General Counsel

¶ 20 The OBA presented evidence to the PRT of its attempts to contact McCormick regarding his neglect of Ms. Johnson's personal injury case. He was sent three letters to his OBA roster address, with requests for a response to the allegations. A certified letter was eventually sent on November 29, 2012, when he failed to respond to the previous letters. He not only failed to respond, but he also failed to claim the certified letter which was returned. He was advised in the certified letter that his failure to respond could result in issuance of a subpoena *duces tecum* requiring his testimony and production of documents relating to Ms. Johnson's grievance. A subpoena was issued and McCormick was served in person, commanding his appearance at a deposition and the production of relevant documents. McCormick arrived an hour late and failed to produce any documents relevant to the case, claiming he could not find Ms. Johnson's file. He agreed to determine whether he possessed malpractice insurance at the time the statute of limitations ran. However, he testified at the hearing on June 12, 2013, that he

had no insurance at that time. (See TR 52:21–23). The OBA's investigator, Tommy Butler, testified he made numerous unsuccessful attempts to reach McCormick. The General Counsel's office did not learn whether McCormick would attend and participate in the hearing until a few minutes before the hearing, when he appeared.

██ ¶ 21 We agree with the PRT that the evidence clearly and convincingly shows McCormick violated Rule 8.1(b), ORPC, and Rules 1.3 and 5.2, RGDP, by his repeated failure to respond to the Bar to answer the allegations raised against him. Of utmost concern to this Court is McCormick's apparent ambivalence to maintaining his law license and practicing law in the future. His wish to keep his license as a fall-back position to the operation of his new business indicates a lack of urgency to meet his obligations to his clients and the Bar. He showed a complete disregard for his client's interests in obtaining a fair settlement of her claim, even causing her a financial hardship by having to pay her own medical bills. His involvement in obtaining Bedlam Sports came at the expense of Ms. Johnson to the extent of abandoning her case and allowing the statute of limitations to run. Her interests clearly became subordinate to his own. By his own admission, his fitness and competence to practice law has waned since he became involved in his business and is not practicing full-time. He admits the business has made him less diligent about the needs of his other two clients, but that they were aware of the reason and understood.

## DISCIPLINE

██ ¶ 22 This Court imposes discipline for attorney misconduct, not for the purpose of punishing the lawyer, but as a means of protecting the public and upholding the integrity of the legal profession. *State ex rel. Oklahoma Bar Association v. Reynolds,* 2012 OK 95, 289 P.3d 1283, citing *State ex rel. Oklahoma Bar Association v. Mothershed,* 2003 OK 34, 66 P.3d 420.

¶ 23 In prior cases involving allegations of negligence and abandonment of clients' cases, the Court's discipline has extended from 60 days in *State ex rel. Oklahoma Bar Association v. Loeliger,* 2005 OK 79, 127 P.3d 591, to disbarment, in *OBA v. Rowe, supra,* depending on the facts in each case.

¶ 24 Both the OBA and the PRT recommend a one-year suspension in this case. Although we find the PRT's findings and conclusions to be supported by clear and convincing evidence, we do not accept its recommendation. The OBA cites us to cases involving neglect of clients' cases. In *Loeliger,* as in this case, the statute of limitations ran on a client's case. However, the attorney answered the OBA's correspondence and cooperated in its investigation. The Court also found the presence of mitigating factors, such as the death of the respondent's father and the payment of full restitution to his clients. In the present case, there are no such mitigating facts present. Ms. Johnson suffered a financial hardship because of McCormick's neglect. McCormick has made no restitution.

¶ 25 Also cited in the OBA's brief are *State ex rel. Oklahoma Bar Association v. Bellamy,* 2012 OK 20, 273 P.3d 56 and *State ex rel. Oklahoma Bar Association v. Whitebook,* 2010 OK 72, 242 P.3d 517, in which both attorneys were alleged, and proved, to have abandoned and neglected their clients' cases.[14] Neither lawyer responded to the OBA or cooperated with its investigation. Neither attended their disciplinary hearings. We expressed concern in *Whitebook* for the apparent lack of value placed on his law license by failing to appear and defend it.

¶ 26 In contrast, McCormick appeared at his deposition and his disciplinary hearing, despite his earlier failure to respond. There are no mitigating facts presented, as in *Loeliger,* which would explain McCormick's lack of attention to his client. Rather, the evidence shows he chose to pursue a business opportunity for himself which he placed above his client's interests. We also have concern, as in *Whitebook,* for his apparent indifference to maintaining his license to practice law. He was less than positive about his desire to continue practicing, but

---

14. Both lawyers were suspended for two years    and one day.

indicated his law license was important to him and that he did not want to lose it.

¶ 27 We find that a suspension of eighteen months is appropriate in this case. While there appears to be no valid excuse for his actions in Ms. Johnson's case, we are aware of no previous grievances filed against him. During that period of time, McCormick will have an opportunity to decide if practicing law is a valuable privilege which he wishes to maintain. If circumstances arise resulting in the disbursal of funds from the Client Security Fund, McCormick will stand liable for the same.

## COSTS

¶ 28 The OBA filed its application for reimbursement of costs in the prosecution of this matter pursuant to Rule 6.16, RGDP, in the amount of $1948.01. The application is granted.

## CONCLUSION

¶ 29 Respondent Stephen Eric McCormick is suspended from the practice of law for a period of eighteen months. He is ordered to pay costs in the amount of $1948.01 within 90 days of the date of this opinion.

COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, GURICH, JJ., Concur.

TAYLOR and COMBS, JJ., Dissent.

COMBS, J., with whom TAYLOR, J. joins, Dissenting:

"I would suspend for two years and one day."