2015 OK 48

STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Farley W. WARD, Respondent,

and

State of Oklahoma ex rel. Oklahoma Bar Association, Complainant,

v.

Rex Earl Starr, Respondent.

SCBD Nos. 6102, 5918.

Supreme Court of Oklahoma.

June 23, 2015.

510

Debbie Maddox, Tommy Humphries, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Douglas W. Sanders, Jr., Poteau, Oklahoma, for Respondent Farley Ward.

Charles F. Alden, III, Oklahoma City, Oklahoma, for Respondent Rex Earl Starr.

GURICH, J.

¶1 On November 14, 2007, the Muskogee County District Attorney's office filed first degree murder charges against two men, Clinton Potts and Chad Pippin, for the 2004 murder of a man named Gregory Clark. Respondent Ward, who was then an assistant district attorney in Muskogee County, was the lead prosecutor at trial. Respondent Starr represented Mr. Potts. The jury trial of Mr. Potts began on July 20, 2009, and lasted until August 3, 2009. The jury found Mr. Potts guilty, and he was sentenced to life in prison without parole. Respondent Starr recommended Mr. Potts retain appellate counsel and proceed with an appeal. In a four-page opinion, the Court of Criminal Appeals reversed his conviction for prosecutorial misconduct and ineffective assistance of counsel. The disciplinary proceedings against Respondent Ward and Respondent Starr stem from such proceedings.

¶2 Respondent Farley W. Ward was admitted to the Oklahoma Bar Association in 1980. He was in private practice until 1984, when he became an assistant district attorney in Haskell County. In 1996, Respondent Ward became first assistant district attorney in LeFlore County, and in 2003, Respondent Ward became a special judge for LeFlore, Latimer, and Haskell Counties. After serving as a special judge for almost two years, he was appointed by Governor Henry to serve the remaining two years of the LeFlore County district attorney's term. Respondent Ward sought reelection but lost narrowly in 2006. In July of 2007, he took the position of assistant district attorney for Muskogee County and worked there for three and a half years. He was then elected district attorney for Pittsburg and Haskell

Counties and has served in that capacity since January of 2011. Respondent Ward has never been disciplined by this Court.

¶ 3 Respondent Rex Earl Starr was admitted to the Oklahoma Bar Association in 1973 and has been in the practice of law for more than forty years. Respondent Starr began in private practice, worked as an assistant district attorney, and then was an assistant U.S. attorney for the Eastern District of Oklahoma until 1984. Since 1984 he has been in private practice in Stilwell. Respondent Starr primarily practices in the area of criminal defense and has represented hundreds of criminal defendants in both state and federal court. He has tried cases all over the state of Oklahoma, in Louisiana, Arkansas, Texas, Missouri, and Tennessee. Respondent Starr also represents a number of school districts in his area and serves as a municipal judge for Stilwell and West Siloam. Since 1962, Respondent Starr has served in the Navy, Army, and Army Reserves, just recently retiring in 2004. In his forty plus years of practicing law in this state he has never before been disciplined by this Court.

### Facts & Procedural History

¶ 4 On December 7, 2004, Greg Clark was found dead in his yard in Wainwright, Oklahoma. The Muskogee County Sheriff's Department worked the case for approximately three years, actively investigating evidence and leads. Although more than seventy-five witnesses were interviewed over the course of the investigation, no suspect was tied directly to the scene through DNA evidence or otherwise, and the evidence obtained as a result of the investigation was largely circumstantial. The district attorney for Muskogee County at the time of the murder, John David Luton, declined to bring charges against anyone for the death of Mr. Clark. In January of 2007, Larry Moore was elected to serve as the new district attorney in Muskogee County.

¶ 5 On November 14, 2007, almost three years after Mr. Clark's death, the Muskogee County District Attorney's office filed first degree murder charges against Mr. Potts and Mr. Pippin, for the murder of Mr. Clark. Mr. Potts and Mr. Pippin were charged in separate cases but the Information filed in each case alleged the two men acted in concert with each other to "effect the death of the victim, Gregory Leon Clark." [1] Although a Bill of Particulars was filed seeking the death penalty in Mr. Potts' case, the State eventually abandoned this claim. Respondent Starr was hired to represent Mr. Potts. Mr. Pippin was represented by Donn Baker. Testimony presented at the PRT hearing established that First Assistant District Attorney, Jeff Sheridan, was initially assigned both cases, but Assistant District Attorney James Walters was primarily responsible for the cases from November of 2007 until his firing on June 22, 2009.[2]

¶ 6 The combined preliminary hearing for Mr. Potts and Mr. Pippin began on April 1, 2008. ADA Walters conducted the portion of the hearing held in April. ADA Sheridan conducted the remainder of the hearing on August 21, 2008. Although ADA Walters testified before the PRT in Respondent Ward's case that Respondent Starr "had my entire case up to that point in time," which he stated consisted of "investigative reports, witness statements and the pictures," he later backtracked and testified that at the time of the preliminary hearing, Respondent Starr was only given the ME report and the OSBI lab reports.[3]

¶ 7 On September 8, 2008, Respondent Starr filed Defendant's Motion for Discovery in Mr. Potts' case and requested, among other standard requests:

[a]ll agreements between the State and any of its witnesses reflecting that said

---

1. Ward, Resp. Ex. 5.

2. *See* Ward, PRT Hearing Transcript at 482–84; 623–625. During their testimony before the PRT, neither ADA Sheridan, ADA Walters, nor District Attorney Moore took full responsibility for the cases.

3. Ward, PRT Hearing Transcript at 521; 540. ADA Walters stated: "Because of the nature of the crime and the nature of this particular defendant that we were dealing with, we weren't prepared to disclose witness identification and locations and such, so we retained the investigative file until trial." *Id.* at 540.

witnesses has or will obtain special or lenient treatment in pending or potential criminal cases in exchange for testimony in this case and any and all consideration or promises of consideration given to any witness by the State or its attorney, including but not limited to immunity, witness fees, assistance to the witness's family or associates of the witness, assistance to or favorable treatment in respect to any criminal action, or anything else which could arguably create an interest or bias in a witness in favor of the State or against the Accused.[4]

The record indicates that on or before February 4, 2009, Shelly Sumpter, ADA Walters' legal assistant gave a copy of the State's discovery notebook to Respondent Starr in person at the Muskogee County District Attorney's office.[5] Ms. Sumpter testified discovery was not yet complete when she gave Respondent Starr the discovery notebook because additional information kept coming in, and as she would get it, she would send it to Respondent Starr.

¶ 8 The trial against Mr. Pippin was scheduled to go first. But shortly before trial, Mr. Pippin's attorney, Mr. Baker, presented ADA Walters with a notice of alibi.[6] Because it was so close in time to trial, ADA Walters testified he thought it was the most prudent decision at the time to dismiss the case and further investigate the alibi. Mr. Pippin's

case was dismissed without prejudice on February 18, 2009.

¶ 9 Near the time of the dismissal of Mr. Pippin's case, the District Attorney's office received information that an inmate by the name of Peter Williams, who was being held at the Muskogee County jail, had information about two murders, one of which was the murder of Mr. Clark. Jeff Smith, a Muskogee County deputy sheriff, interviewed Mr. Williams on February 3, 2009, wherein, Mr. Williams described a purported confession by Mr. Potts to Mr. Williams, while in jail together, regarding the murder of Mr. Clark. Mr. Williams was then interviewed by ADA Walters and ADA Sheridan. After interviewing Mr. Williams, ADA Walters testified he did not immediately endorse Mr. Williams as a witness in the Potts case because he had misgivings about the truthfulness of Mr. Williams' information.[7]

¶ 10 On June 12, 2009, ADA Walters appeared on behalf of the State at a disposition docket, wherein Respondent Starr was present, and informed the court that Mr. Potts' case was ready to proceed to jury trial on the next docket.[8] Ten days later, on June 22, 2009, ADA Walters was terminated from the Muskogee County District Attorney's office.[9] On June 25, 2009, approximately three weeks before trial was set to begin, ADA Sheridan assigned Respondent Ward to the Potts case and advised him the jury trial was set to begin on July 20, 2009. The record reflects

4. Starr, Resp. Ex. 3, ¶ 6 (internal citations omitted).

5. Although she did not remember the exact date, she knew it had to have been before February 4, 2009, because on that date she sent a letter to Respondent Starr advising him of and enclosing additional discovery in Mr. Potts' case, indicating to her he had already received the State's discovery notebook. Ward, PRT Hearing Transcript at 741–43.

6. ADA Walters testified in his deposition in Respondent Starr's case that "it wasn't [an] alibi to take him away from killing or being involved in the killing itself, it would have been the time period immediately after that became question[able]." Starr, Compl. Ex. 133 at 95. In his deposition, ADA Walters testified that at the time of his termination, he intended to re-file charges against Mr. Pippin. Id. at 94–95.

7. Ward, PRT Hearing Transcript at 621. As of June 22, 2009, the date of ADA Walters' termi-

nation from the Muskogee County District Attorney's office, Mr. Williams had not yet been endorsed as a witness for the State in the Potts prosecution.

8. Ward, Compl. Ex. 6.

9. Ward, Compl. Ex. 176 at 009694. The record indicates ADA Walters had been out of the office on vacation for a few weeks and when he returned on Monday the 22nd, District Attorney Moore terminated him. District Attorney Moore testified that ADA Walters was escorted out of the building immediately, and although conflicting evidence exists as to why ADA Walters was terminated, it was apparently unrelated to the Potts prosecution. District Attorney Moore testified he was aware the Potts jury trial "was close at hand" when he fired ADA Walters. Ward, PRT Hearing Transcript at 1009.

that although Respondent Ward had been with the Muskogee County District Attorney's office since July of 2007, up to this point, Respondent Ward had not participated in the investigation or preparation of the Potts case. It was not until ADA Walters was terminated that Respondent Ward began his review of the case.[10]

¶ 11 Respondent Ward testified that upon being assigned the case he asked both ADA Sheridan and Ms. Sumpter if discovery had been completed and both assured him it had. He also called Respondent Starr and asked if he had everything he needed, to which Respondent Starr responded "yes." With less than a month before trial, Respondent Ward testified he spent just about every spare moment he had preparing for trial. He testified he still carried his entire case load in addition to the Potts case and was still being assigned new cases.

¶ 12 As part of his preparation, Respondent Ward interviewed Peter Williams again and decided to endorse him for trial.[11] On July 9, 2009, Ms. Sumpter sent a letter to Respondent Starr advising him of additional discovery in the case. Enclosed with the letter was Peter Williams' Muskogee County booking sheet and a recorded interview with Mr. Williams. On July 10, 2009, the State filed its Witness and Exhibit list for the Potts trial. Respondent Starr filed the Defendant's Notice of Witnesses and Exhibits on July 15, 2009.

¶ 13 The jury trial of Mr. Potts began on July 20, 2009, and lasted until August 3, 2009, with the Honorable Thomas Alford presiding. Although the State's case against Mr. Potts was largely circumstantial because no physical evidence tied Mr. Potts to the scene of the murder, the jury found Mr. Potts guilty.[12] Upon the jury's recommendation, the trial court sentenced Mr. Potts to life in prison without the possibility of parole. The sentencing was held on December 2, 2009.

¶ 14 Although Mr. Potts and his family asked Respondent Starr to appeal the case, Respondent Starr suggested they hire appellate counsel to "have some other eyes look at this." [13] He filed a notice of intent to appeal after Mr. Potts was sentenced and then withdrew from the case. Mr. Potts was first assigned an OIDS public defender but later hired Rob Nigh, Jr. and Darla Sedgwick of Brewster & DeAngelis to handle the appeal. In preparing Mr. Potts' appeal, Ms. Sedgwick testified before the PRT that she called Respondent Starr and asked if he would provide his file to her and visit with her about the case. Respondent Starr agreed. Ms. Sedgwick then went to Respondent Starr's office, picked up his file, and visited briefly with him about the case. Respondent Starr did not see his file again until he picked it up from Mr. Nigh's office in response to the OBA investigation.

¶ 15 After they had reviewed Respondent Starr's file, Ms. Sedgwick and Mr. Nigh went to Respondent Starr's office together and visited with him about the case. Although Respondent Starr agreed to sign an affidavit to assist in Mr. Potts' appeal, Respondent Starr never agreed to sign an affidavit that said he was negligent or ineffective. In fact, Respondent Starr never told either of them he was negligent or ineffective in handling Mr. Potts' case.[14] Ms. Sedgwick testified they did not have a draft affidavit at that meeting and did not "go over any specifics of

10. At some point in May of 2009, shortly before ADA Walters was terminated, the record indicates that District Attorney Moore advised Respondent Ward he would be second-chairing the Potts murder trial. However, ADA Walters refused to give Respondent Ward access to the file at that time. Respondent Ward testified that upon receiving the second-chair assignment, he asked ADA Walters if he could take the Potts file home to review it. Respondent Ward testified ADA Walters responded to the extent of "I don't need your help on this case. I have it all under control, and no, you can't take the file." Ward, PRT Hearing Transcript at 1171. ADA Walters did not remember such conversation and/or reacting in such a way. Nevertheless, Respondent Ward did not review the file at that time.

11. On July 10, 2009, the State, through Respondent Ward, moved to endorse several additional witnesses, including Mr. Williams. Ward, Resp. Ex. 50.

12. Mr. Potts testified against the advice of Respondent Starr.

13. Starr, Compl. Ex. 137 at 80.

14. Starr, PRT Hearing Transcript at 254; 260.

an affidavit."[15]   The record is unclear as to whether Respondent Starr was told the affidavit would be used to allege ineffective assistance of counsel, but Ms. Sedgwick testified: "I don't recall ever sitting down with him and saying, '[t]his is what we found. This is what you're—we found you did deficiently in respect to each one of these people.' None of that occurred, no."[16]   After meeting with Ms. Sedgwick and Mr. Nigh, Respondent Starr testified he never spoke with either attorney again.

¶ 16 Ms. Sedgwick testified she then drafted the affidavit, and Mr. Nigh inserted certain language such as "failed to" and "no strategic reason" so that the affidavit would have meaning under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[17]   The first time Respondent Starr saw the affidavit was July 13, 2010, when Gordon Bulla, the investigator hired by appellate counsel, brought the affidavit by for Respondent Starr's signature.[18]   Respondent Starr, who had been cutting hay, came to his office and signed the affidavit.   Respondent Starr admitted he took a cursory look at the affidavit and did not read it in detail before signing.[19]

¶ 17 Appellate counsel for Mr. Potts then filed an Application for Evidentiary Hearing with the Court of Criminal Appeals.[20]   The application alleged ineffective assistance of counsel, listing seven witnesses that were not called to testify at the trial that appellate counsel argued would have allegedly presented exculpatory evidence with regard to Mr. Potts' involvement in the murder.   Attached to the application as Exhibit 1, among numerous exhibits, was the affidavit signed by Respondent Starr.   The application also alleged the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by not producing discovery on several witnesses.   On September 8, 2010, Assistant Attorney General Don Self entered an appearance on behalf of the State of Oklahoma and filed Appellee's Notice of Agreement with the Defendant's Request for an Evidentiary Hearing and Motion to Hold the Appeal in Abeyance Pending the Outcome of the Hearing.   On November 23, 2010, the Court of Criminal Appeals granted Mr. Potts' request for an evidentiary hearing and ordered the trial court to conduct such within sixty days and to submit findings of fact and conclusions of law.

15.   Starr, PRT Hearing Transcript at 989.

16.   Starr, PRT Hearing Transcript at 1083.   Respondent Starr testified that neither Mr. Nigh nor Ms. Sedgwick ever told him they would be alleging ineffective assistance of counsel before the Court of Criminal Appeals.   Starr, PRT Hearing Transcript at 860;   873.   Mr. Nigh testified that "there was certainly a discussion about the fact that the affidavit was, you know, wanting to be used to support a claim of ineffective assistance of counsel in the brief on direct appeal."   Starr, PRT Hearing Transcript at 412.   But Ms. Sedgwick testified: "I don't know that the words 'ineffective assistance' ever came up."   Starr, PRT Hearing Transcript at 989.

17.   Starr, PRT Hearing Transcript at 143; Starr, Compl. Ex. 135 at 12.   At the PRT hearing, Mr. Nigh was questioned with regard to such language:

Q:   And, but for the type of terminology and but for the statement that he had no strategic purpose generally speaking in this affidavit for the decisions that were made, but for those the concept of your 311 hearing might not be as strong.   Is that correct?

A:   That's correct.   Without—yes, that's correct.   The application for the 311 hearing.

Starr, PRT Hearing Transcript at 413.

18.   Starr, PRT Hearing Transcript at 819.   Ms. Sedgwick testified she faxed the affidavit to Respondent Starr on July 12, 2010.   Starr, PRT Hearing Transcript at 1049.   The fax transmittal sheet indicates it was sent at 5:48 p.m.   Starr, PRT Hearing Ex. 4.   Elaina Starr, Respondent Starr's daughter and legal assistant, testified she did not remember receiving the fax, indicating the fax may have been received after business hours.   Starr, PRT Hearing Transcript at 498.

19.   Starr, PRT Hearing Transcript at 615.   Although Respondent Starr testified he did not feel coerced into signing the affidavit, the record indicates the application to the Court of Criminal Appeals was due the next day.   Ms. Sedgwick testified that "there was a lot to pull together" and she needed the affidavit that day.   Starr, PRT Hearing Transcript at 1016–17.   The record does not indicate whether Respondent Starr was told this information.

20.   Starr, Compl. Exs. 47–48.   The Application for Evidentiary Hearing is authorized by Rule 3.11B(3)(b) of the Rules of the Oklahoma Court of Criminal Appeals.

¶ 18 The hearing was held on January 5, 2011. Respondent Ward left the Muskogee County District Attorney's office in December of 2010, having been elected as district attorney for Pittsburg and Haskell Counties and was sworn in as district attorney for District 18 just days before the evidentiary hearing. Both he and Respondent Starr were subpoenaed by appellate counsel for Mr. Potts to appear at the hearing. Mr. Nigh and Ms. Sedgwick appeared for Mr. Potts, and ADA Sheridan appeared for the State. Assistant Attorney General Don Self was not present for the State at this hearing. District Attorney Moore was also not present for the hearing.

¶ 19 The transcript from the evidentiary hearing reflects that ADA Sheridan immediately told the court he was not prepared and asked the court for a continuance of the hearing. He advised the court there was an application before the Court of Criminal Appeals to extend the deadline to hold the hearing. ADA Sheridan assured Judge Alford the extension would be granted based on his alleged conversations with court staff.[21] The transcript from the hearing then reflects a discussion in chambers with Mr. Nigh, ADA Sheridan, and Respondent Ward, by phone, wherein Mr. Nigh learned that Respondent Ward had been improperly released from his subpoena:

> Mr. Nigh: Your Honor, the Court is aware that I had subpoenaed the prosecuting attorney in this case, Mr. Farley Ward, to appear at 10:00 this morning, and to bring his case file in the Potts case, including any items of discovery that he had produced. I had not released him from that subpoena. The subpoena and the return are filed. He is not here, apparently, based upon the phone conversation that

the parties and the Court just had with Mr. Ward, because he was informed, according to him last night by Mr. Moore, the District Attorney for Muskogee County, that the Court of Criminal Appeals had granted an extension, and the case would not be heard until March.

> Now, also as the parties are aware, the Court of Criminal Appeals has not ruled on the Application for Extension of Time, and I don't know why Mr. Moore would have informed Mr. Ward of that. But it is an improper release of a defense witness by the State of Oklahoma, and I just need to make that of record.[22]

¶ 20 Judge Alford denied ADA Sheridan's motion for continuance and the hearing began. Counsel for Mr. Potts first called Pairrish Meadors, who was the probation and parole officer for Peter Williams. Mr. Nigh introduced Mr. Meador's case files on Mr. Williams from CF–93–981 and CRF–93–985, as an exhibit. ADA Sheridan objected, arguing he hadn't seen any of the materials, that it was prejudicial, and that the hearing should be continued.[23] Judge Alford again denied the continuance. Mr. Nigh then questioned Mr. Meadors about an Application to Revoke the Suspended Sentence of Mr. Williams filed on April 29, 2008. Mr. Meadors testified the application was filed based on a violation report he submitted to the Muskogee County District Attorney's office on April 11, 2008.[24]

¶ 21 Mr. Meadors testified Mr. Williams had initially received an in custody sentence in CF–93–981 and CRF–93–985, but that the balance of that sentence, eleven years, was suspended. Mr. Meadors testified that had the Application to Revoke been granted, Mr. Williams would have been sent back to prison to serve the remaining eleven years of his

21. The Court of Criminals Appeals did grant the extension, but the order granting such was not filed until January 11, 2011, one day after the Findings of Fact and Conclusions of Law were entered. Starr, Compl. Ex. 55.

22. Starr, Compl. Ex. 44 at 13–14. Mr. Nigh testified at his deposition in Respondent Starr's case it was fair to believe the State "sent [Mr. Ward] home in order to delay that proceeding." Starr, Compl. Ex. 135 at 22.

23. Starr, Compl. Ex. 44 at 18. Mr. Williams' case files from CF–93–981 and CRF–93–985 were included in the exhibits attached to the Application for Evidentiary Hearing at the Court of Criminal Appeals.

24. Ward, Resp. Ex. 22. Mr. Meadors also testified he prepared a violation report on Mr. Williams that was filed February 10, 2009, **and was forwarded to ADA Walters.** Starr, Compl. Ex. 44 at 21–22.

sentence, which is what Mr. Meadors had requested from the district attorney's office. Mr. Meadors testified the district attorney's office did not seek revocation of Mr. Williams' suspended sentence at that time because, according to his communications with the district attorney's office, Mr. Williams was a cooperating witness at the time in a murder trial.[25]

¶ 22 At the conclusion of Mr. Nigh's direct examination of Mr. Meadors, ADA Sheridan asked Judge Alford for a brief recess to review Mr. Williams' file. Upon returning from the recess, Mr. Nigh announced to the court the parties were prepared to enter into a stipulation and to submit proposed findings of fact and conclusions of law. The following discussion was had with Judge Alford:

> Mr. Nigh: First of all, I move for admission of what I have marked as Defendant's Exhibit No. 1, which is an Affidavit from Rex Earl Starr, which was attached to Mr. Potts' Application for Evidentiary Hearing, which was filed with the Oklahoma Court of Criminal Appeals. And I don't believe the State objects.
>
> Mr. Sheridan: No objection.
>
> Mr. Nigh: May I offer it to the Court?
>
> The Court: Yes, sir.
>
> Mr. Nigh: In connection with State's Exhibit No. 1, I believe the State is willing to stipulate that if Mr. Starr was called to testify as a witness in this evidentiary hearing, he would provide evidence consistent with that Affidavit, and would testify to the same things that are set forth in that Affidavit, and that the State agrees that that would be the evidence for purposes of this hearing.
>
> Mr. Sheridan: That's correct.
>
> . . . .
>
> Mr. Nigh: And then, Your Honor, I would offer Defendant's Exhibit No. 2, which is a document that I believe the State will stipulate was contained within their file. And I would certainly, for the record, indicate that Mr. Sheridan did not know of the

existence of this document until today. But it was contained within the file of the District Attorney's Office. It is a document in Peter Williams' file, which was referenced by the probation officer during his testimony. But it has a sticky note on it, indicating that the District Attorney's Office—a representative spoke with pardon and parole in reference to the Application to Revoke Mr. Williams' suspended sentence, and indicated that the application had been dismissed because of cooperation by defendant, meaning Mr. Williams, in reference to Potts.

> Mr. Sheridan: James Walters wrote that.
>
> Mr. Nigh: And Mr. Walters, who at one time was prosecuting this case, wrote that note. And I believe the State would stipulate that that was contained within their file, and should have been provided by Mr. Walters to counsel for Mr. Potts, prior to the time of trial.
>
> Mr. Sheridan: That's correct.[26]

Nothing more transpired at the hearing, and upon entering the stipulations into the record, Mr. Potts rested his case. The State put on **no** evidence and the matter was adjourned.

¶ 23 Upon learning he should not have been released from the subpoena, Respondent Ward immediately drove from his office in Stigler to the courthouse in Muskogee. Upon arriving at the courthouse, he learned that the evidentiary hearing had concluded and he would not be testifying. He went downstairs to the district attorney's office and was informed, for the first time, about the sticky note. Respondent Starr was also subpoenaed to testify at the evidentiary hearing. He arrived at the courthouse shortly before 10:00 a.m. and sat in the hall all day waiting to be called to testify. It wasn't until late in the afternoon when Respondent Starr went into the courtroom that he was advised by court staff that the hearing had concluded and that he would not need to testify.[27]

---

25. Starr, Compl. Ex. 44 at 23–24.

26. Starr, Compl. Ex. 44 at 30–33.

27. Starr, PRT Hearing Transcript at 850. At no point did attorneys for either the State or Mr. Potts advise Respondent Starr of what had transpired.

¶ 24 Mr. Nigh drafted the Findings of Fact and Conclusions of Law with no input from either ADA Sheridan or Judge Alford and the document was signed by the trial court and filed on January 10, 2011.[28] On July 21, 2011, the Court of Criminal Appeals, in a four-page opinion, reversed the conviction and remanded the case for a new trial. Although the conviction was reversed for a *Brady* violation and for ineffective assistance of counsel, neither the trial court nor the appellate court independently analyzed either claim. On remand, the murder charge against Mr. Potts was dismissed based on the doctrine of collateral estoppel, and Mr. Potts was released from custody.[29]

### OBA Proceedings

¶ 25 On September 20, 2011, the OBA General Counsel sent a letter to Respondent Starr, with the Court of Criminal Appeals opinion enclosed, advising him she was opening an investigation because the opinion indicated he may have violated the Oklahoma Rules of Professional Conduct. Upon receiving an extension of time to respond, Respondent Starr answered on November 8, 2011, with a detailed letter (before hiring counsel), wherein he states with regard to the affidavit that "[w]hile the Affidavit is generally accurate, it does not address the details of the various items that have presented themselves throughout the case."[30] Respondent Starr went on to state that upon being subpoenaed for the evidentiary hearing, he was "prepared to fully discuss and give testimony as to the Trial process and procedures, as well as expand on the Affidavit that had previously been submitted."[31]

¶ 26 Although the record is unclear as to when Respondent Ward was first notified that he was also being investigated, Respondent Ward answered the OBA's inquiry, through his attorney, on October 24, 2011. Enclosed with his response was an affidavit and the discovery documents relating to Peter Williams. In the affidavit, Respondent Ward stated that although he agreed the documents should have been produced to Respondent Starr, he did not know either document existed prior to or during the trial of Mr. Potts. He stated he specifically asked Mr. Williams if he had been provided any deal with regard to his testimony, and Mr. Williams assured him he had not.

¶ 27 On September 17, 2012, the OBA filed a Complaint against Respondent Starr under Rule 6 of the RGDP, alleging one count of misconduct for failing to provide competent representation to his client, failing to act with reasonable diligence and promptness in representing his client, and engaging in conduct prejudicial to the administration of justice. On June 19, 2013, the OBA amended its Complaint to add a second, alternative count, alleging the affidavit signed by Respondent Starr, which was attached to Mr. Potts' Application for Evidentiary Hearing and filed with the Court of Criminal Appeals, was a false affidavit that Respondent Starr knew would be submitted to the Court of Criminal Appeals and the District Court and that Respondent Starr failed to correct false statements of material fact to both courts.

¶ 28 On February 11, 2014, the OBA filed a Complaint against Respondent Ward under Rule 6 of the RGDP, alleging one count of misconduct for Respondent Ward's failure to provide discovery in the underlying criminal case in violation of ORPC Rule 3.8(d), specifically with regard to six witnesses in the underlying criminal trial. The OBA also alleged Respondent Ward became aware of the discovery violations during trial and that his failure to report such to the trial court violated Rule 3.3 of the ORPC, Candor to the Tribunal. The OBA lastly alleged that Respondent Ward failed to competently prosecute the underlying case and failed to act with reasonable diligence and promptness in the prosecution.[32]

**28.** Starr, PRT Hearing Transcript at 216; Ward, PRT Hearing Transcript at 886; 1123.

**29.** Ward, Compl. Exs. 36–37.

**30.** Starr, Compl. Ex. 5 at 006129.

**31.** *Id.*

**32.** The OBA also initially alleged Respondent Ward failed to request certain jury instructions with regard to jailhouse informants, but dropped that charge after learning that such jury instructions had in fact been given.

¶ 29 Although the OBA filed a motion with this Court on February 12, 2014, to join Respondent Ward and Respondent Starr's respective cases for purposes of the PRT hearing, Respondent Ward objected, and this Court denied the motion on February 20, 2014. Respondent Starr's case was tried to a panel of the PRT on June 2, 3, and 11, 2014. On August 8, 2014, the panel filed its report with this Court, finding Respondent Starr acted competently and diligently in his representation of Mr. Potts. However, the panel recommended Respondent Starr be publicly reprimanded for negligently signing the affidavit without assuring its contents were entirely correct. One member of the panel filed a specially concurring opinion. Respondent Ward's case was tried to a different PRT panel on November 17 through November 21, 2014. The PRT filed its report with this Court on February 24, 2015, recommending the Complaint against Respondent Ward be dismissed. One member of this panel also filed a specially concurring opinion.

¶ 30 The OBA filed an Application to Assess Costs in Respondent Starr's case in the amount of $18,108.09, to which Respondent Starr objected. The OBA filed an Application to Assess Costs in Respondent Ward's case in the amount of $14,235.38, to which Respondent Ward objected. Respondent Starr's case was assigned to this office on December 18, 2014. Because the cases are related, Respondent Ward's case was assigned to this office on February 25, 2015. Briefing was completed in Respondent Ward's case on April 16, 2015.

### Standard of Review

¶ 31 Review of disciplinary proceedings before the PRT is conducted by this Court using a de novo standard. *State of Okla. ex rel. Okla. Bar Ass'n v. Cox,* 2011 OK 73, ¶ 10, 257 P.3d 1005, 1008. As we have announced in prior decisions:

> The ultimate responsibility for deciding whether misconduct has occurred and what discipline is warranted if misconduct is found rests with [this Court] in the exercise of our exclusive original jurisdiction in bar disciplinary matters.

*State of Okla. ex rel. Okla. Bar Ass'n v. Taylor,* 2003 OK 56, ¶ 2, 71 P.3d 18, 21, (citing *State of Okla. ex rel. Okla. Bar Ass'n v. Todd,* 1992 OK 81, ¶ 2, 833 P.2d 260, 262). Factual and legal determinations of the PRT are not binding on us, and any recommendations are merely advisory. *Id.* Likewise, we are required to ensure the OBA has established charges of misconduct by clear and convincing evidence. *State of Okla. ex rel. Okla. Bar Ass'n v. Kinsey,* 2009 OK 31, ¶ 13, 212 P.3d 1186, 1192. Admissions or stipulations must be supported by testimony and/or exhibits, and we will evaluate the weight and credibility of the evidence presented to determine if a lawyer has violated rules governing their professional conduct. *Id.*

### Charges Against Respondent Ward Are Dismissed

#### 1. Discovery

¶ 32 Rule 3.8—Special Responsibilities of a Prosecutor—of the ORPC, provides in part:

> The prosecutor in a criminal case shall:
>
> . . . .
>
> (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal. . . .

The OBA contends that a prosecutor's ethical duty of disclosure under Rule 3.8(d) of the ORPC is broader and more extensive than the scope of disclosure under applicable law because Rule 3.8(d) requires the disclosure of all "evidence or information" favorable to the defense without regard to the anticipated impact of the evidence or information at trial.[33] Although a formal opinion from the

---

**33.** In *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, the U.S. Supreme Court held that "suppression by the prosecution of evidence favorable to an ac-cused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad

ABA Standing Committee on Ethics and Professional Responsibility [34] and the Supreme Court of North Dakota have recently adopted this rationale,[35] we decline to adopt such interpretation and instead join a majority of courts and construe Rule 3.8(d) of the ORPC in a manner consistent with the scope of disclosure required by applicable law.[36]

¶ 33 We agree with the Colorado Supreme Court's interpretation of Rule 3.8(d):

[D]iscovery violations in criminal cases are different from other kinds of disciplinary rule violations for a number of reasons.

First, discovery issues arise in almost every criminal case. Trial courts routinely make findings of fact and enter orders and sanctions designed to respond to the severity of the violation. As a result, the problems are visible, immediately addressed, and any harm to the public or the individual parties is dealt with in the context of the pending case.... [M]anagement, regulation, and supervision of discovery [is] preeminently a trial court function.

*In re Attorney C,* 47 P.3d at ·1173. And any discovery violations not appropriately dealt

---

faith of the prosecution." (emphasis added). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." *Id.* at 437, 115 S.Ct. 1555.

The Court of Criminal Appeals, in *Dodd v. State,* 2000 OK CR 2, ¶ 25, 993 P.2d 778, 784, set forth additional mandatory disclosures in criminal cases when a jailhouse informant is expected to testify at trial:

At least ten days before trial, the state is required' to disclose in discovery: (1) the complete criminal history of the informant; (2) any deal, promise, inducement, or benefit that the offering party has made or may make *in the future* to the informant (emphasis added); (3) the specific statements made by the defendant and the time, place, and manner of their disclosure; (4) all other cases in which the informant testified or offered, statements against an individual but was not called, whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; (5) whether at any time the informant recanted that testimony or statement, and if so, a transcript or copy of such recantation; and (6) any other information relevant to the informant's credibility.

*See also* 22 O.S.§ 2002.

**34.** *See* ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 09–454.

**35.** *In re Disciplinary Action Against Cynthia Feland,* 820 N.W.2d 672 (N.D.2012) (holding that "the plain language of Rule 3.8(d) does not impose a materiality element similar to that applied under *Brady* " and that a "prosecutor's failure to comply with the duties imposed by Rule 3.8(d) should not be excused merely because, based

upon the other evidence presented at trial, the result in the case would have been the same").

**36.** *See, e.g., In re Disciplinary Proceedings Against Sharon A. Riek,* 350 Wis.2d 684, 834 N.W.2d 384 (2013) (rejecting the position of the ABA Committee on Legal Ethics & Professional Responsibility and finding that adopting such a rationale would impose inconsistent disclosure obligations on prosecutors because a prosecutor could "fully comply with the constitutional obligations the Court has outlined under *Brady,* but still be in violation of the Model Rule"); *Disciplinary Counsel v. Kellogg–Martin,* 124 Ohio St.3d 415, 923 N.E.2d 125 (2010) (holding that the rule of professional responsibility requiring a prosecutor to make timely disclosure of the existence of evidence, known to the prosecutor, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment, imposed no requirement on a prosecutor to disclose information that he or she was not required to disclose by applicable law); *In re Roger W. Jordan, Jr.,* 913 So.2d 775 (La.2005) (finding that the language of Rule 3.8(d) was recognizably similar to the prosecutor's duty set forth in *Brady* and its progeny and that the prosecutor violated the rule by not disclosing *Brady* material); *In re Attorney C,* 47 P.3d 1167 (Colo.2002) (holding that the rule of professional conduct that addresses the special responsibilities of a prosecutor in a criminal trial required the court to impose the materiality standard of *Brady* and that such rule was limited to circumstances where a prosecutor intentionally withheld exculpatory evidence). Several jurisdictions have also amended their Rules of Professional Conduct or added commentary to explain the scope of the model rule. *See* D.C. Rules Prof'l Conduct R. 3.8 cmt. 1 (2015) (clarifying that their comparable ethics rule "is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure); N.C. Rules Prof'l Conduct R. 3.8(d) (2015) (requiring timely disclosure of "all evidence or information required to be disclosed by applicable law, rules of procedure, or court opinions").

with by the trial courts of this state can be redressed on appeal by the Court of Criminal Appeals within the context of the particular case. The role of this Court in criminal discovery is limited to those "cases in which conduct occurs that reflects upon the character of the prosecutor: conduct that cannot be fully addressed by orders relating to the underlying case." *Id.* at 1174.

¶ 34 Prosecutors have the "responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Okla. Rules Prof'l Conduct R. 3.8 cmt. 1. "[A] criminal trial is not a game of hide and seek. Gamesmanship in discovery will not be condoned. The responsibility of a prosecutor as an officer of the court is to treat matters of this type with the seriousness that they deserve. An attorney representing the State is expected to fully comply with requests for discovery." *Baker v. State*, 2010 OK CR 19, ¶ 5, 238 P.3d 10, 12 (internal citations omitted). Supervisors and lawyers with managerial responsibilities:

are obligated to ensure that subordinate lawyers comply with all their legal and ethical obligations. Thus, supervisors who directly oversee trial prosecutors must make reasonable efforts to ensure that those under their direct supervision meet their ethical obligations of disclosure, and are subject to discipline for ordering, ratifying or knowingly failing to correct discovery violations. To promote compliance with Rule 3.8(d) in particular, supervisory lawyers must ensure that subordinate prosecutors are adequately trained regarding this obligation. Internal office procedures must facilitate such compliance.[37]

Prosecutors not personally responsible for a criminal prosecution could also be subject to a violation of the ORPC "for concealing or intentionally failing to disclose evidence or information to the colleague responsible for making disclosure pursuant to Rule 3.8(d)." [38]

¶ 35 Although the sticky note produced by the State at the evidentiary hearing has been described in these proceedings as the smoking gun, the record is littered with inconsistent testimony with regard to whether the State afforded any benefit to Peter Williams in return for his testimony in the Potts case.[39] Even assuming a benefit was

37. ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 09–454 at 5 (citing Model Rules of Prof'l Conduct R. 5.1 cmt. 1). Although we decline to adopt certain aspects of ABA Formal Opinion 09–454, the opinion does provide guidance with regard to a supervising lawyer's role in criminal discovery.

For example, when responsibility for a single criminal case is distributed among a number of different lawyers with different lawyers having responsibility for investigating the matter, presenting the indictment, and trying the case, **supervisory lawyers must establish procedures to ensure that the prosecutor responsible for making disclosure obtains evidence and information that must be disclosed.** Internal policy might be designed to ensure that files containing documents favorable to the defense are conveyed to the prosecutor providing discovery to the defense, and that favorable information conveyed orally to a prosecutor is memorialized. Otherwise, the risk would be too high that information learned by the prosecutor conducting the investigation or the grand jury presentation would not be conveyed to the prosecutor in subsequent proceedings, eliminating the possibility of its being disclosed. **Similarly, procedures must ensure that if a prosecutor obtains evidence in one case that would negate the defendant's guilt in another**

case, **that prosecutor provides it to the colleague responsible for the other case.**
ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 09–454 at 5. *See also In re Donald V. Myers*, 355 S.C. 1, 584 S.E.2d 357, 362 (2003) (stating that a district attorney "must implement and manage a system that enables him to appropriately supervise his [assistants] so that when he discovers that they may be violating a Rule of Professional Conduct, he can immediately ameliorate any prejudicial effect that the violation may have on the defense").

38. ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 09–454 at n. 42 (citing Model Rules of Prof'l Conduct R. 3.4(a); 8.4(a); 8.4(c); 8.4(d)).

39. ADA Walters testified before the PRT that neither he nor ADA Sheridan promised Mr. Williams anything in exchange for his cooperation with regard to the Potts case. Additionally, both ADA Walters and ADA Sheridan testified that they would have needed to get approval from District Attorney Moore to give Mr. Williams a deal. District Attorney Moore testified there was a plea form that would be filled out and put inside the file if there was an agreement made. No such form was found in Mr.

given to Mr. Williams and assuming that such was material to the outcome of the trial,[40] no clear and convincing evidence exists that Respondent Ward knew about the benefit, could have learned about it by further investigation, or could have inferred from the circumstances that a benefit had been given.[41]

¶ 36 The OBA argues that had Respondent Ward pulled Mr. Williams' file, he would have become aware of the benefit provided to him. While we agree Respondent Ward should have pulled Mr. Williams' file during his trial preparation, the OBA has not proven by clear and convincing evidence that if he had, he would have become aware of any benefit provided to Mr. Williams.[42] Respondent Ward interviewed Mr. Williams and his first question to him was whether he had been given anything or promised anything in exchange for his testimony, to which he responded no. Respondent Ward testified that Mr. Williams was "the one who would stand to have benefitted from any deal that had been made, so I thought if anyone would know about it, it would be him, and he

wouldn't have any reason to lie to me that I [could] see." [43]

¶ 37 In addition to the benefit given to Mr. Williams, the OBA also alleged Respondent Ward failed to provide Respondent Starr with Mr. Williams' OSBI rap sheet. Section 2002(g) of Title 22 requires the State to disclose OSBI rap sheets "on any witness listed by the state or the defense as a witness who will testify at trial." Respondent Ward testified that at some point during the trial, shortly before Mr. Williams' testimony, he realized the OSBI rap sheet for Mr. Williams had not been included in the discovery materials provided to Respondent Starr. Upon realizing this, Respondent Ward testified he notified Respondent Starr of such, and because he did not have access to OSBI rap sheets, he did the best he could to remedy the situation and printed off the Department of Corrections print-out for Mr. Williams and provided it to Respondent Starr for cross-examination. Although Respondent Ward did not produce the OSBI rap sheet with regard to Mr. Williams, the OBA has failed to demonstrate that such was material to the outcome of the trial.[44] With regard to Mr.

---

Williams' file, and DA Moore testified he did not know until the day before his testimony before the PRT that ADA Walters had dismissed Mr. Williams' application to revoke. Finally, in the State's Notice of Compliance with Discovery and *Dodd v. State*, filed in the case *after* remand from the Court of Criminal Appeals, the State advised with regard to Peter Williams that:

> The District Attorney's Office ha[d] not made any prior deals, promises or inducements to Peter Williams, in any criminal case currently pending against Peter Williams in Muskogee County, for his testimony in the above styled case. In 2009, prior to the first jury trial, the District Attorney's Office did bestow a benefit to Peter Williams in CF–1993–981 and CF–1993–985 by choosing not to file a probation violation. Peter Williams was never made aware of this benefit.

Ward, Compl. Ex. 6, Notice of Compliance with Discovery and *Dodd v. State* (June 20, 2012).

40. Although the State stipulated at the evidentiary hearing there had been a *Brady* violation with regard to Mr. Williams, Judge Alford testified before the PRT there was no meaningful testimony put on at the hearing by the State regarding any of the allegations raised by Mr. Potts. Ward, PRT Hearing Transcript at 1118.

41. Rule 3.8(d) requires proof from the OBA that the undisclosed evidence was "known to the prosecutor." Under the terminology section of

the ORPC "knowingly" means "actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." Okla. Rules of Prof'l Conduct Terminology.

42. The record is unclear as to the whereabouts of the sticky note during the months leading up to the trial. ADA Walters testified he did not put the sticky note in the Potts file. Nothing on the Potts file jacket indicates any reference to the sticky note or to any benefit given to Mr. Williams. Ward, Resp. Ex. 67. There is no evidence as to when the sticky note was put in the Williams file or whether the sticky note had been moved to the Williams file at the time Respondent Ward was preparing for trial. When the sticky note was produced to the OBA, it was attached to a February 13, 2009 supplemental violation report. The PRT panel found the evidence was unclear as to whether the sticky note was even stuck to the same document it was stuck on when it was produced to the OBA. Ward, Report and Recommendation of the Trial Panel at 39–40.

43. Ward, PRT Hearing Transcript at 245.

44. Ward, PRT Hearing Transcript at 264. Starr, Compl. Ex. 42, Vol. VIII at 114–115.

Williams, the OBA did not prove by clear and convincing evidence that Respondent Ward violated Rule 3.8(d).

¶ 38 A man named Eddie Ellis also testified at trial that he began living with Mr. Potts in January of 2005, and that over a period of time, Mr. Potts confided in Mr. Ellis and made numerous incriminating statements to him regarding the murder of Mr. Clark. Although Mr. Ellis testified at trial that he had not been promised anything by the State in return for his testimony, four days after the trial concluded, ADA Sheridan dismissed a pending arson charge against Mr. Ellis. Clear and convincing evidence exists that the State, through ADA Sheridan, made a deal with Mr. Ellis in return for his testimony in Mr. Potts' case and that such was not disclosed to the defendant.[45] Nevertheless, the OBA has not demonstrated that the failure to disclose the deal with Mr. Ellis was material to the outcome of the trial.[46] And even assuming such was material, again, the OBA did not prove by clear and convincing evidence that Respondent Ward knew about the deal, could have learned about it by further investigation, or could have inferred from the circumstances that a deal had been made.

¶ 39 The OBA alleges that had Respondent Ward pulled Mr. Ellis' file, he would have been put on notice that Mr. Ellis was "connected to the Potts and Pippin prosecution." Although a notation on the district attorney's file jacket from May 11, 2009, says in parenthesis "connected to Potts & Pippin," Mr. Ellis had already been endorsed as a witness when Respondent Ward took over the case and had testified at the preliminary hearing. So references in Mr. Ellis' file that he was "connected to Potts & Pippin" are not surprising. What is blatantly missing from Mr. Ellis' file is any notation by ADA Sheridan, the prosecutor assigned to Mr. Ellis' arson case, that a deal had been made with Mr. Ellis for his testimony in the Potts case. ADA Sheridan testified "[t]here is no notation of any type of disposition of that case or

either case concerning Edward Ellis." [47] When ADA Sheridan was asked at the PRT hearing whether he ever discussed with Respondent Ward that a deal had been made with Mr. Ellis, he answered, "I doubt—I don't think so." [48] The OBA did not prove by clear and convincing evidence that Respondent Ward violated Rule 3.8(d) with regard to Mr. Ellis.

¶ 40 The OBA also alleged Respondent Ward failed to provide the required OSBI rap sheets for Velma Jan Walkingstick, Robert Epperson, Jimmy Sellers, and Bobby David Burwell, all of whom were witnesses in the underlying trial. Our de novo review of the entire record produced in this case and in Respondent Starr's case does not clearly reflect whether OSBI rap sheets for these witnesses were provided to Respondent Starr. Although Respondent Ward himself should have ensured the OSBI rap sheets had been included in discovery, Respondent Ward was assured by ADA Sheridan, Ms. Sumpter, and Respondent Starr that discovery was complete. Even if we assume the OSBI rap sheets for the above-listed witnesses were not provided to Respondent Starr, the OBA has not proven by clear and convincing evidence that his failure to disclose such was material to the outcome of the trial. As such, they have not proven a violation of Rule 3.8(d).

### 2. Competence and Diligence

¶ 41 With regard to Rules 1.1 and 1.3 of the ORPC, the PRT noted in its report, "District Attorneys' offices may not turn down new cases merely because they are already busy.... While prosecutors are duty bound to adequately prepare for every trial, the preparation required to meet the Rule 1.1 standard of 'reasonably necessary for the representation' cannot be viewed in a vacuum." Ward, Report and Recommendation of the Trial Panel at 49–50. Although not an excuse for failing to adequately prepare for trial, this Court is "mindful of the

45. Ward, PRT Hearing Transcript at 855–858.

46. Starr, Compl. Ex. 42. Vol. V at 150–151; 131; Ward, Resp. Ex. 53.

47. Ward, PRT Hearing Transcript at 926.

48. Ward, PRT Hearing Transcript at 858.

voluminous caseloads managed by most prosecutors." *Riek,* 834 N.W.2d at 392.

¶ 42 In the case before us, the record reflects that all assistants in the Muskogee County District Attorney's office, as well as District Attorney Moore, carried a very heavy case load.[49] District Attorney Moore testified that prosecutors were to get ready for trial as best they could, sometimes even on a moment's notice.[50] Upon receiving the assignment to the Potts case, Respondent Ward did just that in the approximately twenty-five calendar days he had to prepare. He testified he spent just about every waking moment preparing for the trial while still receiving case assignments in other matters, making court appearances, and juggling his own case load. The OBA questioned Respondent Ward about why he did not seek a continuance to have more time to prepare for trial. Respondent Ward testified that when he asked Respondent Starr about a possible continuance, Respondent Starr told him he wouldn't be able to agree to a continuance because his client was in jail and had been for some time. When Respondent Starr could not agree to a continuance Respondent Ward testified he knew he had to just "buck up and get ready and win or lose, put the trial on."[51] The OBA did not present clear and convincing evidence that Respondent Ward failed to competently and diligently prosecute the case.

¶ 43 As the specially concurring member of the PRT panel summed up, "[i]t was not Respondent, but the State of Oklahoma acting through the office of the Muskogee County District Attorney's Office, before and after Respondent's departure, that may be assessed the responsibility for any discredit to the legal profession."[52] We are convinced by the evidence offered in mitigation that Respondent Ward is not "a prosecutor who loves victory more than he loves justice."[53] The Complaint against Respondent Ward is dismissed, and he is exonerated of all charges. The OBA's Application to Assess Costs in this matter is denied.

### Charges Against Respondent Starr Are Dismissed

#### 1. Competence and Diligence

¶ 44 "Professional competence, meaning acting promptly in pending matters and communicating with clients, is a mandatory obligation imposed upon attorneys licensed by this Court. Failing to provide competent representation, failing to keep a client reasonably informed about the status of a matter or explaining a matter to the extent reasonably necessary to permit a client to make informed decisions regarding the representation, and failing to act with reasonable diligence and promptness in representing a client have all formed the basis for professional discipline."[54] There simply

49. District Attorney Moore testified that there could be sixty to seventy-five cases set for trial by the judge and that the district attorney's office was expected to be prepared to try all of those cases in a two to three week jury docket. District Attorney Moore testified that during the month between the disposition docket and the beginning of the jury term, one assistant district attorney could have anywhere from ten to twelve to twenty cases to prepare for trial.

50. He testified that they "interviewed the witnesses [they] could have interviewed.... [W]ith the caseload that we have you actually have some times that you cannot interview a witness. They will not show up, you cannot find them, sometimes they don't—we've started trials without witnesses and they show up two or three days within the trial and you get to see them in the hall when you call them in." Ward, PRT Hearing Transcript at 1017–18.

51. Ward, PRT Hearing Transcript at 240. Judge Alford testified before the PRT that although he couldn't say for sure what he would have done in the situation, if Respondent Starr had objected to a continuance, he probably would not have granted it. During his preparation, Respondent Ward had also talked to the victim's family and although he didn't specifically remember discussing a continuance with them, he did remember them being adamant about the case being tried because they wanted justice done.

52. Ward, Report and Recommendation of the Trial Panel (Hilsher, Lawyer Member concurring at 63–64). We note that the report issued by the PRT in Respondent Ward's case was a thoughtful and detailed report that provided much aide in this Court's consideration of the issues in this case.

53. *State ex rel. Okla. Bar Ass'n v. Miller,* 2013 OK 49, 309 P.3d 108 (Taylor, J., dissenting).

54. *State ex rel. Okla. Bar Ass'n v. Green,* 1997 OK 39, ¶ 21, 936 P.2d 947, 952 (internal citations omitted). *See also State ex rel. Okla. Bar Ass'n v.*

is no evidence in the record, much less clear and convincing evidence, that supports a finding that Respondent Starr acted incompetently or with a lack of diligence in his representation of Mr. Potts. The PRT dismissed this count, and in fact, found that "the record reflects not only Mr. Starr's competence, but his excellence as a trial lawyer." [55]

¶ 45 Jury trials are not an exact science. A lawyer's decision about what witnesses to call or not call at trial is an exercise of professional judgment, and lawyers must make informed and sound judgment calls in the heat of the moment at trial. The record clearly shows Respondent Starr acted competently and diligently in making such decisions for his client. This Court is not in the business of playing the Monday-morning quarterback. Just because counsel for the OBA would have defended the case differently, does not mean Respondent Starr did not provide his client with competent representation. Respondent Starr is exonerated on this charge.

### 2. The Affidavit

¶ 46 With regard to the affidavit, we are not convinced Respondent Starr made a false statement to any tribunal or third person by signing the affidavit, and we are certainly not convinced Respondent Starr intentionally signed the affidavit to commit some fraud upon the courts.[56] There is absolutely no evidence in our record of misrepresentation by Respondent Starr, and in fact, the record reflects that he has an "outstanding reputation for being an honest gentle-

man." [57] Respondent Starr was not part of some scheme to secure a reversal of Mr. Potts' conviction.

¶ 47 What the record does reflect is that Respondent Starr relied on appellate counsel to accurately relate the facts of the case in the affidavit. Respondent Starr presumed the contents of the affidavit were true, and upon our review of the entire record, we find the contents of the affidavit do in fact accurately reflect Respondent Starr's handling of the case. Nevertheless, Respondent Starr was hasty in signing the affidavit and admits he was negligent in failing to ensure he agreed with each and every word. For example, paragraph 3 of the affidavit states:

I failed to interview any witnesses contained in the State's discovery with the exception of Mr. Potts' former girlfriend, Wendy Vogt, and co-defendant, Chad Pippin.

In his testimony before the PRT, Respondent Starr quibbled with the use of the words "failed to." But otherwise, the statement is accurate. Respondent Starr testified he interviewed the co-defendant, with permission from Mr. Pippin's attorney while Mr. Pippin was in jail. Respondent Starr also interviewed and spoke with Wendy Vogt, Mr. Potts' former girlfriend, "probably a dozen times." Starr, PRT Transcript at 617. Respondent Starr testified it wasn't necessary for him to interview the State's approximately seventy-five potential witnesses because he had listened to recorded interviews and read their statements and knew what each witness would testify to. Respondent Starr testified

---

*McCormick*, 2013 OK 110, 315 P.3d 1015 (finding lack of diligence often includes abandonment of a client's case); *State ex rel. Okla. Bar Ass'n v. Benefield*, 2005 OK 75, 125 P.3d 1191 (failing to appear at a plea hearing for a client in a criminal case and failing to appear at a jury trial for criminal client constituted lack of competence and diligence); *State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, 848 P.2d 543 (failing to file suit and misrepresenting such to client constituted lack of diligence); *State ex rel. Okla. Bar Ass'n v. Borders*, 1989 OK 101, 777 P.2d 929 (failing to notify mother of criminal defendant about status of case and losing abstract of title in another case constituted lack of diligence).

55. Starr, Report of the Professional Responsibility Tribunal at 17.

56. On several occasions, the OBA asked questions of Respondent Starr to the effect of: "You're aware that this affidavit freed your client, aren't you?" Starr, PRT Hearing Transcript at 848. While Respondent Starr's affidavit *may* have contributed to the reversal of the conviction, Mr. Potts was not released from prison simply because Respondent Starr signed the affidavit, as the OBA mistakenly argues. The Court of Criminal Appeals reversed the conviction and remanded for a new trial also on the basis of a *Brady* violation. In preparing for a new trial, Mr. Nigh filed a motion to dismiss on the basis of collateral estoppel, which was eventually granted by the trial court some seven months later.

57. Starr, PRT Hearing Transcript at 1103.

that none of the witnesses put his client with the victim near the time of the crime, so he did not believe it necessary to interview each of them. He also learned from other sources about the witnesses' criminal and social histories.

¶ 48 Paragraph six of the affidavit provides:

> In discovery provided to me the following witnesses had given statements that were material to the issues at trial and would have been exculpatory for Mr. Potts. I had no strategic reason for not calling the following witnesses to testify: a. Kyle Myers b. Misty McIntosh c. Tracy Glover d. Jeff McCart e. Michael Harnage f. Earl Botts g. Cody Humphers h. Gwen Lara.

Again, in his testimony before the PRT, Respondent Starr questioned the use of the word "strategic," but testified several of these witnesses were acquaintances of Mr. Potts and had long criminal histories, which Respondent Starr did not want to associate with his client. Several had credibility issues because of their prior convictions and prior drug use. Misty McIntosh was a former girlfriend of Mr. Potts with whom he had a child. Respondent Starr testified before the PRT that she "would not [have been] a good witness for Clinton Potts. I'll leave it at that." [58]

¶ 49 Most of these witnesses would have also presented testimony that implicated the co-defendant, Mr. Pippin, in the murder. Respondent Starr testified that one of his objectives at trial was to minimize Mr. Pippin's involvement in the murder because even though Mr. Pippin's case had been dismissed, the State continued to assert the same theory at trial—that Mr. Potts and Mr. Pippin acted together in the murder. Respondent Starr testified he believed implicating Mr. Pippin in the murder created a serious risk with respect to his client's involvement. [59]

¶ 50 Our record clearly reveals that appellate counsel for Mr. Potts inserted the words "failed to" and "no strategic reason" throughout the affidavit to achieve a certain result on appeal. Had Respondent Starr been given the opportunity to testify at the evidentiary hearing, he would have explained in greater detail each of the statements in the affidavit and there would have been no misunderstanding about the meaning of his affidavit. Instead, because the State was completely unprepared to put on evidence at the evidentiary hearing, the statements in the affidavit have gone unchallenged until now "by the light of truth we call cross-examination." [60] The PRT, up to this point, is the only tribunal to have received evidence and examined the contents of the affidavit in light of the evidence in the underlying case. After hearing several days of testimony and reviewing the jury trial transcript and record in the underlying criminal case, the most the PRT could conclude was that Respondent Starr "should have reviewed the affidavit more carefully" to "be as accurate as possible." [61] The PRT concluded Respondent Starr was negligent in signing the affidavit and recommended a public censure. Although we agree Respondent Starr negligently signed the affidavit, we decline to impose any discipline against Respondent Starr. These proceedings against Respondent Starr have been punishment enough. [62]

58. Starr, PRT Hearing at 656.

59. Although the case against Mr. Pippin was dismissed, the Information in Mr. Potts' case was never amended. When Respondent Ward was questioned as to why he, as the prosecutor, did not amend the Information, he testified it would not have been consistent with the evidence produced in the investigation. Respondent Starr testified he did not believe the State had taken inconsistent positions and that the Information was not defective. Mr. Nigh testified that reasonably well-informed lawyers could have come to different conclusions on whether the Information should have been quashed and whether the State was pressing inconsistent theories.

60. Report of the Professional Responsibility Tribunal (Crosthwait, Lawyer Member concurring at 6).

61. Report of the Professional Responsibility Tribunal at 17.

62. "[O]ur responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view of safeguarding the interest of the public, of the courts, and of the legal profession." *State ex rel. Okla. Bar Ass'n v. Layton*, 2014 OK 21, ¶ 33, 324 P.3d 1244, 1259.

Under the facts and circumstances of this case, and considering Respondent Starr's forty-year career with no previous discipline, the Complaint against Respondent Starr is dismissed in its entirety. The OBA's Application to Assess Costs in this case is denied.

### Conclusion

¶ 51 It bears repeating that the Findings of Fact and Conclusions of Law filed after the evidentiary hearing in the underlying criminal case were drafted *entirely* by appellate counsel for Mr. Potts with the intention of gaining a reversal. The trial court signed off on the Findings of Fact and Conclusions of Law, which upon review, clearly reflect appellate counsel's untested theory of the case.[63] The Court of Criminal Appeals then reversed Mr. Potts' conviction for prosecutorial misconduct and ineffective assistance of counsel *relying solely on these Findings of Fact and Conclusions of Law.* The State's failure to make any kind of record at the evidentiary hearing and its blatant attempt to sweep the misgivings of the Muskogee County District Attorney's office under the rug at the expense of Respondent Starr has exponentially compounded all aspects of this case.[64] The reversal of Mr. Potts' conviction is not supported by the evidentiary record presented to the PRT.

¶ 52 The OBA's interest in prosecutorial ethics and protection of criminal defendants is a worthy and most timely concern, but the investigation into Respondent Ward and Respondent Starr's handling of this case is not worthy of the time and effort employed.[65] While we agree that the buck must stop somewhere that somewhere is not with Respondent Ward or Respondent Starr. It is with the District Attorney, who is ultimately responsible for the prosecution of cases in the county and who, as chief administrator of the office, is at least partially responsible for the conduct and trial tactics of his or her assistants.[66]

**BAR DISCIPLINARY PROCEEDINGS AGAINST RESPONDENT FARLEY W. WARD AND RESPONDENT REX EARL STARR ARE DISMISSED; RESPONDENT FARLEY W. WARD AND RESPONDENT REX EARL STARR ARE EXONERATED; OKLAHOMA BAR ASSOCIATION'S APPLICATIONS FOR COSTS IN BOTH PROCEEDINGS DENIED.**

¶ 53 ALL JUSTICES CONCUR.

---

63. For example, the Findings of Fact and Conclusions of Law discuss the testimony that would have been given by Kyle Myers, Misty McIntosh, Tracy Glover, Jeff McCart, Michael Harnage, Earl Botts, and Cody Humphers had Respondent Starr called such witnesses to testify at trial. But none of these witnesses were actually called to testify *at the evidentiary hearing* to substantiate this alleged testimony, and to date, none of these witnesses, except Earl Botts, have been subject to cross-examination concerning their knowledge of Mr. Clark's murder. We note that Earl Botts, who testified at the preliminary hearing, was cross-examined by Mr. Baker, counsel for Mr. Pippin, and was thoroughly impeached. Mr. Botts admitted to frequent drug use and convictions for concealing stolen property, false impersonation, and workers' compensation fraud. Starr, Compl. Ex. 40 at 82–96. Mr. Baker testified before the PRT that upon his cross-examination of Mr. Botts at the preliminary hearing, he believed he had fabricated his testimony.

64. Starr, Compl. Ex. 138 at 69–70; Starr, Compl. Ex. 135 at 39; Starr, PRT Hearing Transcript at 149–150; Starr, Compl. Ex. 137 at 135–136. Curiously, the Court of Criminal Appeals commended the Attorney General's office for "giving thoughtful consideration to the merits of Appellant's claims before filing a response brief, and for conceding early on that an evidentiary hearing was warranted." Starr, Compl. Ex. 60 at n. 4. Yet, no one from the Attorney General's office bothered to appear at the evidentiary hearing on behalf of the State and contest any of the allegations raised in Mr. Potts' appeal.

65. Ward, Report and Recommendation of the Trial Panel (Hilsher, Lawyer Member concurring at 63–64).

66. *Miller,* 2013 OK 49, ¶ 29, 309 P.3d 108, 120.